**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,                                    Crim. No. 21-60 (JRT/BRT)

Plaintiff,

v.                                                          **REPORT AND**
                                                           **RECOMMENDATION**
(1) Andrew Jerome Bigbee, and
(2) Danielle Lyn Thompson,

Defendants.

Nathan H. Nelson, Esq., United States Attorney's Office, counsel for Plaintiff.

Daniel P. Repka, Esq., Repka Law, LLC, counsel for Defendant Bigbee.

Paul P. Sarratori, Esq., Mesenbourg & Sarratori Law Offices, P.A., counsel for Defendant Thompson.

This action came before the Court on July 29, 2021, for a hearing on various pretrial motions filed by Defendants Andrew Jerome Bigbee and Danielle Lyn Thompson. (Doc. No. 82.) The Court has since ruled on Defendants' non-dispositive motions. (Doc. No. 85.) Remaining before the Court is Defendant Thompson's Motion to Suppress Evidence as a Result of Search and Seizure (Doc. No. 39), Defendant Bigbee's First Motion to Suppress Evidence (Doc. No. 43), and Defendant Bigbee's Second Motion to Suppress Evidence (Doc. No. 78).

Defendants Bigbee and Thompson are charged in the Indictment with two drug offenses stemming in part from an October 16, 2020 search by police of a motor home that revealed several pounds of methamphetamine, namely one count of conspiracy to

distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846; and one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (Doc. No. 1, Indictment.) In addition, Defendant Bigbee is separately charged in the Indictment with a second count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) stemming from the police search of his residence on September 4, 2019, which revealed, among other items, 526 grams of methamphetamine. (*Id.*)

Defendants Thompson and Bigbee seek to suppress any evidence obtained from the motor home as a result of the October 16, 2020 search, as well as evidence obtained from the search warrant that stemmed from it, on the grounds that such evidence was obtained in violation of their Fourth Amendment right to be free from unreasonable search and seizure. (*See generally* Doc. No. 96, Defs.' Joint Mem. in Supp. of Mots. to Suppress as a Result of Unlawful Searches and Seizures ("Defs.' Mem.").) Defendant Bigbee also seeks to suppress evidence obtained from a Dodge Ram truck and his residence during the execution of search warrants because those search warrants were partly based on information gathered by officers from a storage yard, which Defendant asserts the officers entered without authority. (*Id.*) The Government opposes Defendants' motions. (*See generally* Doc. No. 99, Gov't. Mem. in Opp'n. to Defs.' Mots. to Suppress Evidence ("Gov't. Mem.").) For the reasons stated below, this Court recommends that Defendants' motions be denied.

I.    **FACTS**

   **A.  October 2020 motor home search**

   Around midnight on October 16, 2020, Bloomington police received a 911 call of
"suspicious activity" on the 101st block of Chicago Avenue in the City of Bloomington.
(Doc. No. 86, Tr. 17–20; Doc. No. 83, Gov't. Ex. 3 at 3.) The caller reported that "three
vehicles" had parked in front of an address and that for the past forty minutes people had
been "coming and going" from a parked motor home. (Tr. 18.) The caller reported that
four to five people had entered the motor home and that the caller "suspected drug use
and narcotics-related activity." (Tr. 18–19; Gov't. Ex. 3 at 3.) The caller gave a first name
and phone number to police. (Tr. 20.)

   Within approximately "a couple minutes" of the call, Bloomington Officer
Michael Smith and another officer in training arrived at the address where the motor
home was parked. (Tr. 20–21.) With their lights off, they parked their squad car behind
the motor home and watched to "observe any activity." (Tr. 21.) Officer Smith saw
"multiple vehicles" parked in front of the address the caller had given, including a motor
home with a car trailer hitched to its rear carrying a Pontiac sedan. (Tr. 21, 24–25; Gov't.
Ex. 3 at 3.) The motor home sat parked on a public street along the curb in front of a fire
hydrant. (Tr. 23–24.)[1] A check of the motor home's license plate numbers revealed the
motor home was licensed and registered to operate on the road and was owned by a man
named D.M. (Tr. 25.) Another check of the license plate numbers on the Pontiac sedan

---

[1]    Officer Smith testified that this was not an area of the city that was "designated for
permanent living or permanent parking and camping." (Tr. 24.)

and the car trailer revealed they were registered to Defendant Andrew Bigbee. (*Id.*) The officers also learned that Bigbee had an outstanding felony arrest warrant for a drug offense. (Tr. 28; Gov't. Ex. 3 at 3.)

As Officer Smith and his trainee officer sat in their squad car, Officer Smith observed a man passing to and from the motor home to a house and its driveway. (Tr. 22.) The man carried a flashlight. (*Id.*) After the man made a couple of trips from the motor home to the house, the man shined his flashlight at the squad car. (*Id.*) At that point Officer Smith knew that "the jig [was] up," so he flicked the squad car's headlights on and pulled the squad car up closer to the back of the motor home where he parked. (Tr. 22–23.) Officer Smith and the trainee officer then stepped out of the squad car and walked over to motor home with their flashlights. (Gov't. Ex. 7 at 05:23:27–40.) As they did, Officer Smith shined his flashlight at the motor home. (*Id.*) He noticed the motor home's engine was running and that it had no utilities connected to it. (Tr. 24.) Officer Smith later testified that the motor home appeared to him to be "[d]efinitely movable." (*Id.*)

As the officers approached, the man who had shined his flashlight at their squad car exited the front entry door of the motor home and greeted them on the lawn. (Tr. 25–26; Gov't. Ex. 7 at 05:23:40–47.) The man was D.M., the same D.M. who was the registered owner of the motor home. Officer Smith informed D.M. that they had received a call about "a bunch of people parked out" in front of the house and asked if he was the owner of the motor home. (Tr. 26; Gov't. Ex. 7 at 05:23:47.) D.M. confirmed that he was the owner of the motor home, then he began to complain that a neighbor had called the

police on him before. (Tr. 26–27; Gov't. Ex. 7 at 05:23:55–05:24:40.) He started to walk away from the motor home and asked the officers if they "kn[e]w anything about cars." (Gov't. Ex. 7 at 05:24:45.) Officer Smith understood D.M.'s question to be an attempt by D.M. to misdirect their attention away from the motor home. (Tr. 27.)

The trainee officer asked if there was anyone inside the motor home. (Gov't. Ex. 7 at 05:25:03.) D.M. said that there were just "a couple of friends and their dog" and that, because of the dog, "it's probably not good that you go in there." (Tr. 27–28; Gov't. Ex. 7 at 05:25:05–55.) When Officer Smith asked D.M. if he lived at the address facing the public street where the motor home was parked, D.M. responded that he lived at a different address. (Tr. 27; Gov't. Ex. 7 at 05:25:58–05:26:15.) The trainee officer said, "Well, do you understand why it's a little weird that you're parked here but you live over somewhere else." (Gov't. Ex. 7 at 05:26:45–50.) D.M. responded, "I do find that kind of weird, but be that as it may, that's the case." (Gov't. Ex. 7 at 05:26:50–59.)

While the officers talked to D.M., Officer Smith shined his flashlight into the open door of the motor home and looked inside. (Gov't. Ex. 7 at 05:24:20–55; Tr. 31.) There, on the floor of the motor home's cockpit, he noticed a small, folded-up piece of tinfoil. (Tr. 32.) Officer Smith later testified that in his training and experience tinfoil is "often used" as "drug paraphernalia" either to smoke or snort narcotics from or for packaging of narcotics, and that though tinfoil could have many innocent uses, here it was "folded up seemingly in many different folds," which Officer Smith recognized as "extremely common for narcotics packaging and/or use of narcotics." (Tr. 33.)

After some conversation, Officer Smith asked D.M. what the names of the people

inside the motor home were. (Tr. 28; Gov't. Ex. 7 at 05:27:08.) D.M. asked, "what do you need to know that for?" (Gov't. Ex. 7 at 05:27:10.) Officer Smith explained he needed to know "who we're dealing with." (Gov't. Ex. 7 at 05:27:12–19.) D.M. then told them that a man named "Andy" and a woman whose name he thought was Jessica was inside the motor home. (Tr. 30, Gov't. Ex. 7 at 05:27:30–05:28:10.) Throughout this exchange, Officer Smith noticed that D.M. "became defensive" when he was asked who was inside the motor home and that D.M. refused to "give [Officer Smith] a straight answer" and continued to misdirect the officers. (Tr. 28, 30.) Officer Smith also noticed that each time he asked "something potentially incriminating," such as "Andy's last name," D.M. would "kind of hem and haw . . . and stall for time as if he was attempting to lie to me or figure out some story that he could make up" and would continue to misdirect. (Tr. 30–31.)

The officers figured the man named "Andy" was likely Defendant Andrew Bigbee because the trailer and Pontiac were registered to him. (Tr. 28.) Because the officers knew Bigbee had an active felony drug warrant, Officer Smith asked D.M. if it was all right for him to go inside and speak with Andy. (Tr. 33–34; Gov't. Ex. 7 at 05:28:30.) "Why do you want to go in my RV?" D.M. asked. (*Id.*) Officer Smith explained that he needed to talk to Andy about "his personal business." (*Id.*) D.M. said, "how about if I call him out." (*Id.*) Officer Smith said that was fine. (*Id.*) Then D.M. walked into the motor home to get "Andy." (Tr. 34; Gov't. Ex. 7 at 05:28:45–05:29:15.) While D.M. was inside the motor home, Officer Smith yelled, "Andy, it's the police. Can you come out and talk to me please?" (Gov't. Ex. 7 at 05:29:15–20; Tr. 34–35.) As he stood there waiting for

"Andy" to come out, Officer Smith noticed through the open door another person inside who appeared to be a woman. (Tr. 34, 39.)

A minute later, D.M. exited the motor home. As he did, a man who police would soon identify as Bigbee told him to "close the door." (Gov't. Ex. 7 at 05:29:45.) D.M. did so. (Tr. 35; Gov't. Ex. 7 at 05:29:58.) D.M. then began to walk away from the motor home. (Gov't. Ex. 7 at 05:30:00.) "Can you open that back up so Andy can come out?" Officer Smith asked. (Gov't. Ex. 7 at 05:30:05.) D.M. turned back to the motor home's door and, moving between the officers and the motor home, pressed his hand against the door with his back to police, explaining to the officers he had shut the door because Andy had "asked me to shut it, so I just shut it." (Gov't. Ex. 7 at 05:30:10–05:30:30.) He continued to keep his hand pressed against the door as police asked him to "open that please." (Gov't. Ex. 7 at 05:30:30–05:30:45.) Officer Smith said, "Do me a favor, would you back away from the RV, please?" (Gov't. Ex. 7 at 05:30:41.) "No," said D.M. (Gov't. Ex. 7 at 05:30:43.) D.M. continued pressing his hand against the door and standing with his body between the officers and the motor home's door. (Gov't. Ex. 7 at 05:30:43–05:31:05.)

As D.M. continued to press against the door, Officer Ken LeBaron, who had arrived at the scene after Officer Smith and his trainee officer, observed Bigbee through the motor home's windshield "nervously walking around." (Tr. 145.) He then watched as Bigbee, acting "quickly and in a hurried manner," moved to the middle of the motor home and started digging in something. (Tr. 36, 146; Gov't. Ex. 8 at 05:30:19.) Bigbee then "pick[ed] up a bag" and proceeded to "put something inside the bag" and "open[ed]

7

the fridge." (Tr. 146–47; Gov't. Ex. 8 at 05:30:35–45.) When Officer LeBaron called out to the other officers describing what Bigbee was doing, Bigbee immediately moved to the front of the motor home and shut the curtains, completely obstructing the officers' view into the motor home from all sides. (Tr. 147; Gov't. Ex. 8 at 05:30:48–05:31:12.) Officer LeBaron understood this as an attempt to try to "conceal criminal activity." (Tr. 147.) Officer Smith also became concerned that Bigbee was trying to hide or destroy incriminating evidence.

With the curtains drawn and Bigbee not responding to police calls to exit the vehicle, the officers questioned D.M further and shined their flashlights around the motor home as its engine continued to run. (Gov't. Ex. 7 at 05:31:00–05:37:00.) At one point, Officer Smith told another officer to watch the windshield "in case he puts this into gear." (Gov't. Ex. 7 at 05:31:30–36.) Meanwhile, Officer Smith returned to a squad car where he and other officers pulled up a photo of Bigbee on a computer to compare it to the man they had seen inside the motor home. (Tr. 39, Gov't. Ex. 7 at 05:36:55–05:39:28.) Officer Smith confirmed the man was Bigbee.[2] (Tr. 39.) Officer Smith also noted to the officers that he had "dealt" with D.M. before over a neighbor dispute and that D.M. and his neighbor were both "meth heads." (Gov't. Ex. 7 at 05:38:28.)

At that time, Officer Smith did not yet know the identity of the unknown female inside that D.M had called "Jessica." (Tr. 39.) He radioed in and asked for dispatch to

---

[2]    Officer Smith testified that he had been able to get a "fantastic shot of Mr. Bigbee's face" when Bigbee had "looked directly at" Officer Smith. (Tr. 38.)

look up any female associates to Bigbee. (Tr. 40.) Dispatch identified a female named H.F. (*Id.*) H.F. was "extremely known to all Bloomington police officers" as well as Officer Smith because she had been "arrested several times for narcotics" and "ha[d] fled from police in vehicles." (*Id.*) When dispatch ran her name, "it came back that [H.F.] had a felon in possession warrant at that time" for "either a pistol, tear gas, [or] stun gun." (*Id.*; Gov't. Ex. 7 at 05:39:55–05:40:40.)

At this point, Sergeant Mansur arrived at the scene. (Tr. 40–41.) Officer Smith updated Sergeant Mansur on what had happened so far. (Gov't. Ex. 7 at 05:41:15.) He also informed Sergeant Mansur that they had identified Bigbee inside the motor home, that Bigbee had a felony drug warrant, that the 911 caller had identified multiple people inside the motor home, that there was an unknown female associate inside the motor home with Bigbee that could be H.F., and that H.F. had a warrant for felony possession of a weapon which could possibly be a pistol. (Gov't. Ex. 7 at 05:41:15–05:43:53.) With this information, the officers could not rule out the possibility of firearms inside. (Gov't. Ex. 7 at 05:46:12–50.) The officers discussed putting spike strips under the tires because the motor home was "running and he could take off." (Gov't. Ex. 7 at 05:47:00–20.) Spike strips were placed under the motor home's two rear tires. (Gov't. Ex. 7 at 05:48:00–05:50:45.)

After that, Sergeant Mansur shouted into a bullhorn to call Bigbee and the unknown female out of the motor home. (Tr. 41; Gov't. Ex. 7 at 05:51:52.) A few minutes later, Bigbee exited. (Gov't. Ex. 7 at 05:53:35; Gov't. Ex. 8 at 05:53:35; Tr. 41.) Officer Ryan Arbuckle, who had arrived at the scene shortly after Officer Smith and

Officer LeBaron, handcuffed Bigbee and placed him in the back of a squad car. (Tr. 104; Gov't. Ex. 12 at 05:55:15–05:59:00.) As he did, Officer Arbuckle asked Bigbee who the unknown female was inside the motor home. (Gov't. Ex. 12 at 05:55:36–05:56:00). Bigbee told him she was "Danny"; Bigbee clarified her full name was Danielle Thompson, and that she was not H.F. (*Id.*) Officer Arbuckle asked Bigbee how long the motor home had been parked at the curb, to which Bigbee responded, "I don't know. An hour, maybe." (Gov't. Ex. 12 at 05:57:04–09.)

With Bigbee secured, using the bullhorn, Sergeant Mansur directed "Danielle" to exit the motor home. (Tr. 42–43; Gov't. Ex. 7 at 05:59:54.) A woman then exited the motor home. (Tr. 43; Gov't. Ex. 7 at 06:01:20.) Officer Smith interviewed the woman in the driveway and confirmed she was Danielle Thompson after inspecting her identification. (Tr. 43; Gov't. Ex. 7 at 06:04:30–06:05:40.) He asked Thompson if there were any drugs inside the motor home. (Gov't. Ex. 7 at 06:02:58.) Thompson responded, "Not that I'm aware of, no." (Gov't. Ex. 7 at 06:03:02.) Officer Smith asked her how long she had stayed in the motor home. (Gov't. Ex. 7 at 06:06:45.) Thompson said, "I haven't been. I stay at my . . . that address," referring to the address on her identification card.[3] (Gov't. Ex. 7 at 06:06:48–58.) Officer Smith then asked Thompson where Bigbee usually stays. (Gov't. Ex. 7 at 06:07:05.) Thompson answered, "I don't know . . . wherever." (*Id.*) Officer Smith noticed during this conversation that Thompson "appeared

---

[3]    Later, Thompson stated that she lived with her grandmother and her mom in a house and that her girlfriend had dropped her off at the motor home. (Gov't. Ex. 7 at 06:37:25–06:37:45.)

nervous in nature," and he felt that she was "withholding information." (Tr. 44.)

Police now had D.M and Thompson outside the motor home while Bigbee sat locked in a squad car. But the officers knew that the initial caller had reported seeing four to five people, and only three had been identified. (Tr. 44–45.) Thus, police conducted a protective sweep of the motor home to make sure no one else was inside. (Tr. 45–46.) First, Sergeant Mansur opened the motor home's front door and shouted into the motor home: "Bloomington police, anyone in here? Announce yourself now." (Gov't. Ex. 7 at 06:13:31.) No one responded. Five officers—Sergeant Mansur, Officer Arbuckle, Officer Huss, Officer Smith, and the trainee officer—then moved through the motor home in single file with their flashlights and guns drawn. (Tr. 46; Gov't. Ex. 7 at 06:13:45–06:15:20.) They walked from front to back but found no other people inside. (Tr. 46.) As they filed back out, Officer Smith noticed a money counter on a table and a red purse within view filled with a "massive wad of $100 bills." (Tr. 47, 49.) He bent down to get a closer look at the purse and shined his flashlight at the bills sticking out. (Tr. 49; Gov't. Ex. 7 at 06:16:00–21.) Officer Smith found the money counter and cash to be significant because money counters were a common device used in the drug trafficking business as well as "large amounts of cash." (Tr. 47–48.)

The officers finished their sweep—which took approximately three minutes—and walked to the front of the motor home. There, Officer Arbuckle picked up the piece of folded tinfoil on the floor that Officer Smith had observed earlier. (Tr. 49–50.) Officer Arbuckle unfolded it and noticed some residue inside; he and Officer Smith thought it looked like drug residue. (*Id.*; Gov't. Ex. 7 at 06:16:45–06:17:45; Gov't. Ex. 12 at

06:16:00–06:17:45.) The officers then exited the motor home. (Gov't. Ex. 7 at 06:19:05; Tr. 50.)

After exiting, the officers continued separate conversations with Thompson and D.M. in front of the house. Officer Smith questioned Thompson about the money he saw in the red purse. (Tr. 51; Gov't. Ex. 7 at 06:23:17–35.) Thompson stated she had $20,000 in cash in her purse; some she had received from a motorcycle accident settlement and some were winnings from a casino. (Tr. 51; Gov't. Ex. 7 at 06:23:33–06:24:25.) Officer Smith, based on his experience working narcotics cases, found this suspicious and believed the cash to be more likely associated with narcotic activity considering the other evidence he had already observed that night. (Tr. 52–54.) Officer Smith then asked, "Is it okay if I look in your purse just to verify what you told me?" (Gov't. Ex. 7 at 06:24:52.) He added that he was just "trying to validate" her story. (Tr. 55; Gov't. Ex. 7 at 06:25:15.) Thompson agreed to grab her purse and open it for Officer Smith. (Tr. 55; Gov't. Ex. 7 at 06:25:24.) Officer Smith and Thompson walked together into the motor home to retrieve the purse and then walked out of the motor home back to the front of the house. (Gov't. Ex. 7 at 06:25:25–06:26:25.) There, Thompson opened her purse and showed Officer Smith the contents inside, including wads of cash bound in rubber bands, a THC vape cartridge, and a glass bubble pipe with what Officer Smith believed to be burnt methamphetamine residue inside. (Tr. 55–56; Gov't. Ex. 7 at 06:27:00–06:32:30.)

Meanwhile, Officer Arbuckle interviewed D.M. (Tr. 109–14.) He told D.M. they had seen Bigbee "digging around pretty hard" in the motor home and asked for D.M.'s consent to conduct a search. (Gov't. Ex. 12 at 06:24:48–06:25:30.) D.M. then gave

consent for them to search the area where Bigbee had been doing the "weave bob" and accompanied officers into the motor home. (Tr. 113; Gov't. Ex. 12 at 06:29:04–06:31:25.) D.M. sat in the front passenger seat of the motor home next to Officer LeBaron where he could observe the search. (Tr. 114.) Officer Arbuckle and Officer Huss then began to search the living area, including the sink and countertop region, as well as in some of the upper and lower cupboards. (Tr. 115; Gov't. Ex. 12 at 06:31:45.) In one of the cupboards to the side of the sink, Officer Arbuckle found several hundred dollars in cash, which he found suspicious because "[d]rug dealers often deal in cash to support their dealing, and so currency or large amounts of currency are typically indicative of narcotics dealing or trafficking." (Tr. 115–16.) In the same area, Officer Arbuckle also found a plastic baggie with six "M-box"[4] pills, which also seemed suspicious to Officer Arbuckle because they were "not packaged in a typical pill bottle" but instead were in a "small zipper baggie"; Officer Arbuckle later testified this "is often indicative of illicit or illegal narcotics."[5] (Tr. 115–18.)

D.M. then questioned whether the officers might be damaging his motor home. (Tr. 119; Gov't. Ex. 10 at 06:37:28–06:38:15.) He told the officers, "I hate to say it, guys, but I think you're done searching . . . I don't want anything torn apart . . . I just don't want anything torn apart." (Gov't. Ex. 10 at 06:37:28–45.) Officer LeBaron then told

---

[4]    As the Government explains, M-box pills are blue, round narcotic pills with an imprinted letter M on the pills' surface. (Gov't. Mem. 16 n.6.)

[5]    Officer Arbuckle had seen M-box pills "very often" in past drug busts and testified that they could sometimes contain oxycodone or fentanyl. (Tr. 117–18.)

D.M. that they were not here to break or damage any property. (Gov't. Ex. 10 at 06:37:45–59.) D.M. said, "As long as he's not breaking anything . . . ." (Gov't Ex. 10 at 06:37:54.) Officer Arbuckle heard D.M. talking to Officer LeBaron and stopped what he was doing and walked over to D.M. to address his concerns. (Tr. 119.) He told D.M. "Yeah, I'm not breaking anything." (Gov't. Ex. 10 at 06:37:57.) Then he asked D.M., "You were talking about you . . . wanting us to stop searching?" (Gov't. Ex. 10 at 06:38:00.) D.M. responded, "No, no, that's . . . I was just wondering what, you know, I mean, it's a small space." (Gov't. Ex. 12 at 06:38:01.)

Officer Arbuckle then explained to D.M. that because they had found cash and a baggie of M-box pills, they would continue their search of the motor home. (Tr. 119; Gov't. Ex. 12 at 06:38:15–06:39:30.) D.M. asked questions about some of the mail the officers had found in Bigbee's name, then he said, "I don't know, just go ahead and do whatever . . . ." (Gov't. Ex. 12 at 06:38:53–06:39:04.) Officer Arbuckle responded with "Okay." (Gov't. Ex. 12 at 06:39:04.)

The officers continued their search beyond the "main living area" and into other areas of the motor home. (Tr. 120.) Officer LeBaron moved to the bedroom. (Tr. 150.) There, near the side of the bed, he found a suitcase "half-zipped" leaning next to the bed that contained several pounds of vacuum sealed bags of methamphetamine. (Tr. 151; Gov't. Ex. 10 at 06:44:50–06:45:50.) Officer Smith, who was standing outside next to Thompson, then learned over the radio that the motor home contained methamphetamine, and he arrested Thompson with help from other officers. (Gov't. Ex. 7 at 06:47:00–06:56:00.) After police secured Thompson in a squad car, Officer Smith entered the

motor home where Officer Arbuckle showed him what they had found, including the several pounds of methamphetamine inside the suitcase and a cooler with methamphetamine. (Tr. 150–51, 120–21; Gov't. Ex. 12 at 06:56:15–06:57:30.) Officer Smith told Officer Arbuckle that they had probable cause to search the motor home, but that they should contact the Special Investigation Unit so they could get involved. (Tr. 121; Gov't. Ex. 7 at 06:58:53.) Officer Arbuckle agreed and said he would continue with the probable cause search while Officer Smith conferred with the Special Investigation Unit. (Gov't. Ex. 7 at 06:59:28.) Ultimately, the Special Investigation Unit took over the investigation and, a few hours later, applied for a search warrant based in part on the 911 call, the officer's knowledge of Bigbee's "[f]elony narcotics warrant," the officer's observations of Bigbee, the large sums of cash found in Thompson's purse and money found inside the motor home, Thompson's "meth bubble pipe," and the discovery of "7lbs of suspected methamphetamine in a suitcase." (Tr. 58, 121, 151; Gov't. Ex. 3.) The Special Investigation Unit executed the warrant the same day and searched the motor home further. (Gov't. Ex. 3.) During the subsequent search, they found and seized forty-three listed items, including more methamphetamine, bubble pipes, a digital scale, Ziploc gallon bags, mushrooms, and marijuana. (Gov't. Ex. 3 at 9–10.)

## B. August 2019 storage yard observations and subsequent warrants for the Dodge Ram and Bigbee's residence

On August 19, 2019, officers with the Edina Police Department responded to a report from a security officer with Wings Financial at France Avenue in Edina, MN that an ATM had been stolen. (Tr. 165–66; Gov't. Ex. 1 at 2.) Surveillance video showed two

suspects parking a large dark-colored pickup with an attached flatbed trailer to the south

of the ATM. (Tr. 166; Gov't. Ex. 1 at 2.) One of the suspects was wearing dark pants, a

"drab" green shirt, a white hard hat, and a white bandana over the face. (Tr. 166–67;

Gov't. Ex. 1 at 2.) The other suspect was wearing dark pants, a black hooded sweatshirt

with large white lettering in a circular pattern on the front, and a respirator-style mask

over the face that was colored pink where the respirator portion would typically be.

(Tr. 166–67; Gov't. Ex. 1 at 2.) Both suspects appeared to be wearing light-colored

gloves. (Gov't. Ex. 1 at 2.) The video also showed the two suspects attaching a large

metal plate connected to a metal chain to the back of the ATM, then attaching the chains

to the trailer, accelerating the truck several times, and yanking the ATM from its housing.

(*Id.*)

A little over a week later, Edina police received a call from a concerned citizen

("CC") who had received information regarding the theft of an ATM from a bank on

France Avenue in Edina, MN. (Tr. 167; Gov't. Ex. 1 at 2.) Many details of the theft

provided by the CC had not been released to the public. (Tr. 168; Gov't. Ex. 1 at 2.) The

CC named the suspects responsible for the theft as D.F. and Bigbee. (Tr. 167; Gov't. Ex.

1 at 2.) The CC told police, among other things, that D.F. and Bigbee used a truck to steal

the ATM, which they had brought to a storage yard located off Highway 13 and Boone

Avenue in Savage, MN across from a Jet Black business. (Tr. 168–69; Gov't. Ex. 1 at 2.)

Using the information provided by the CC, Detective Morgan Piper of the Edina

Police Department located the storage yard. (Tr. 169; Gov't. Ex. 1 at 3.) Her search

revealed a business located at that address called Steve Brenner Hauling. (Tr. 169.) When

she called the number, the owner of the business Steve Brenner answered. (Tr. 170.)

Detective Piper identified herself as a police officer and asked the business owner if he

was familiar with D.F. (*Id.*) Mr. Brenner said he was. (*Id.*). Mr. Brenner said he was not

the owner of the storage yard where his business was located but that he was the

"manager or caretaker" and that he ran the "day-to-day business of the lot." (*Id.*) He

agreed to let Detective Piper and two other detectives come down and look around. (Tr.

171.)

Detective Piper, along with two other detectives, drove down to the storage yard

on August 28, 2019 (9 days after the ATM theft) and met with Mr. Brenner, who allowed

them to walk through the lot. (Gov't. Ex. 1 at 3.) The lot was an open, gravel yard

surrounded by a chain-link fence with a gate that opened and closed to the road. (Tr. 171–

72.) There was no covering or roof. (Tr. 172.) There were no buildings, only vehicles and

some equipment and construction materials. (*Id.*) The only enclosed space was a shipping

container that Mr. Brenner used as his office. (*Id.*) When Detective Piper arrived, the gate

to the lot was already open. (Tr. 173.)

After some conversation, Mr. Brenner told the detectives that D.F. and Bigbee

kept items in a space on the lot. (Tr. 173–74.) He directed them to it. (*Id.*) In the space

was a black Dodge Ram 2500 crew cab pickup truck. (*Id.*) Mr. Brenner told the

detectives that it had recently arrived on the lot. (Tr. 174.) The detectives walked up to

the truck and looked through its windows. (Tr. 174–75.) Inside they saw a black hooded

sweatshirt with large white lettering on the front, a respirator-style mask with pink pieces

on the front, a white hard hat and white latex gloves, and the same type of heavy-duty

chains that police had observed in the ATM surveillance video. (Tr. 175.) At no time did the detectives enter the truck or open its doors in any way. (*Id.*) After providing the license plate number to Edina dispatch, dispatch advised the detectives that police had recently stopped the truck and that Bigbee was the driver. (Tr. 177; Gov't. Ex. 1 at 3.) Based on this information, police obtained two warrants, one to seize the Dodge Ram truck and tow it to a secure facility and another to search the truck. (Tr. 175–76; Ex. 4–5.) The search revealed items related to the ATM theft along with the items the detectives had observed through the window. (Gov't. Ex. 1 at 3.)

Upon further investigation, other surveillance video from a business next to the storage yard showed the Dodge Ram, around six hours after the ATM theft, entering the storage yard with a flatbed trailer. (*Id.*) The investigation also revealed that photographs of the location of where the ATM was allegedly buried showed a bright-orange Camaro with black racing stripes parked at the location, which was the same car that officers had found parked in the driveway of Bigbee's residence in Richfield, MN. (*Id.* at 3–4.)

With the information collected to date, on September 3, 2019, police obtained a search warrant for Bigbee's residence in Richfield, seeking evidence of the ATM theft. (Gov't. Ex. 1 at 4.) Officers executed the search warrant on September 4, 2019. (Gov't. Ex. 2 at 5.) Inside they found, among other things, methamphetamine along with several firearms. (Gov't. Ex. 2 at 5.) After coming across drugs and firearms, the officers obtained another search warrant to expand their search beyond evidence related to the ATM theft. (*Id.*) Ultimately, when the officers had finished their search, they had discovered, among other items, 526 grams of methamphetamine. (Gov't. Ex. 1 at 9;

Gov't. Ex. 2 at 10.)

## II.   ANALYSIS

Defendants jointly seek to suppress evidence seized by the police during their warrantless entry into and search of the motor home and their subsequent search pursuant to a search warrant. Defendant Bigbee also separately seeks to suppress the evidence seized pursuant to the search warrants for the Dodge Ram and his residence. This Court addresses Defendants' arguments below.

### A.   Whether the evidence seized from the motor home should be suppressed

Defendants argue the police needed a warrant to enter the motor home, which they did not obtain until after they had made several warrantless entries. The Government, on the other hand, contends that the police's entries were justified under exceptions to the warrant requirement, including the automobile exception and the protective sweep exception. The Government also argues that Defendant Thompson lacks standing to challenge the search because she has no legitimate expectation of privacy in the motor home.

#### 1.   Whether Thompson has standing

The Government argues that Thompson lacks standing to challenge the search of the motor home because Thompson was only a passenger in the motor home. (Gov't. Mem. 25.) Passengers generally do "not have standing to challenge a vehicle search where [the passenger] has neither a property nor a possessory interest" in the vehicle. *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quotations omitted). Here, Thompson has not shown that she has either a property or possessory interest in the

motor home. Nor has she demonstrated that she meets any of the other relevant factors that courts look at when determining standing. *See id.* (listing various factors relevant to determining standing, including "ownership," "possession and/or control of the area searched," and "historical use of the property") (citation omitted). Indeed, as Thompson told officers, she had not been staying in the motor home but lived in a house with her mother and grandmother and that her friend had dropped her off at the motor home that night. Thus, this Court finds that Thompson did not have an expectation of privacy in the motor home and she does not have standing to challenge the search. Accordingly, Thompson's motion should be denied.

### 2. Whether the automobile exception applies

Defendants argue that a warrant was required to search the motor home because it was being used as a residence, not as a vehicle. (Defs.' Mem. 10.) The Government, however, asserts that the automobile exception applies, and therefore the police did not need a warrant to lawfully search the motor home. (Gov't. Mem. 26–30.)

Though generally under the Fourth Amendment "a warrant is required to ensure a search's reasonableness," the Supreme Court has long "recognized an exception to the Fourth Amendment's warrant requirement when officers search an automobile." *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). This exception, known as the "automobile exception," derives from the "practical challenges of obtaining a warrant for a vehicle that could be quickly moved" as well as the diminished expectation of privacy one has in an automobile. *Id.* (citing *Carroll*, 267 U.S. at 153, and *South Dakota v. Opperman*, 428 U.S. 364, 367

(1976)). In short, the automobile exception "justifies searches [of a vehicle] without prior recourse to the authority of a magistrate so long as the overriding standard of probable cause is met." *Id.* (quotations omitted).

The automobile exception can apply to a motor home when the motor home is readily mobile. *See California v. Carney*, 471 U.S. 386 (1985). As explained in *Carney*:

> When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes-temporary or otherwise-the two justifications for the vehicle exception come into play.[] First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling. At least in these circumstances, the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable.

*Id.* at 392–93. Thus, the application of the exception turns "on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation." *Id.* at 394. In *Carney*, the Supreme Court considered various factors to determine whether a motor home was readily mobile, including its license status, whether it is connected to utilities, and if it has convenient access to a public road. *Id.* at 394 n.3. Finding that the motor home was parked in a public lot and not hooked up to any utilities, the Supreme Court determined that the motor home was readily mobile and in a setting that objectively indicated that it was being used for transportation. The Supreme Court found "abundant probable cause to enter and search the vehicle for evidence of a crime notwithstanding its possible use as a dwelling place." *Id.* at 395.

21

Here, every factor delineated by the Supreme Court in *Carney* supports finding that the motor home was "being used for transportation." *Id.* First, the motor home had four movable wheels. Its engine was running. Indeed, police worried that it would become mobile: they kept watch over the windshield in case Bigbee would put the motor home into gear and they slid spike strips under the two rear tires to prevent the motor home from driving off. According to Bigbee, the motor home had just pulled up recently—about an hour before police arrived. *See United States v. Hamilton*, 792 F.2d 837, 843 (9th Cir. 1986) ("The mobility of the motor home is amply demonstrated by the fact that it was moved the night before the search was conducted."). Second, the motor home was "licensed" to operate on public roadways and was hauling a trailer behind it. *Carney*, 471 U.S. at 394 n.3. Third, the motor home was not "connected to utilities," either water, septic, or electricity. *Id.* And fourth, the motor home had "convenient access to a public road" because it was already parked on a public road beside the curb. *Id.* In fact, the motor home was parked in front of a fire hydrant and not in an area designated for permanent living or permanent parking and camping, reinforcing the objective indicators that would suggest that it was not there long—and was likely to move again. *See id.* at 392–93, 404 (stating that if a motor home is "being used on the highways, or if it is readily capable of such use and is found stationary in a place *not regularly used for residential purposes*—temporary or otherwise—the two justifications for the vehicle exception come into play.") (emphasis added). Defendants' argument that the automobile exception does not apply because the motor home "was parked and not moving" and "was clearly the destination of the occupants for that night" not only ignores the holding

in *Carney* but fails to address the factors delineated by *Carney*. (Defs.' Mem. 14–15.) The mobility of a vehicle, which in part justifies dispensing with the warrant requirement, "refers not merely to the immediacy with which a vehicle may be moved, but to the possibility that it could be moved at all." *United States v. Maccani*, 526 F. Supp. 3d 420, 448 (N.D. Iowa 2021).[6]

Based on the record, this Court finds that the motor home here was readily mobile and objectively situated in such a way that it was being used for transportation. Therefore, the automobile exception applies to the police officers' warrantless search of the motor home.

### 3.  Whether the protective sweep was justified

The officers' first entry into the motor home was to perform a protective sweep. The Fourth Amendment permits a protective sweep "if the searching officer possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *United States v. Alatorre*, 863 F.3d 810, 813 (8th Cir. 2017) (citing *Maryland v. Buie*, 494 U.S.

---

[6]    *See also United States v. Markham*, 844 F.2d 366, 369 (6th Cir. 1988) (concluding that the motor home at issue "was being used as a vehicle and not as a residence" because it had "wheels," "bore Tennessee license plates," sat "parked in a driveway connected to a public street," and "there were no utility lines connected to the motor home"); *United States v. Aguilar*, 338 F. App'x 736, 737 (9th Cir. 2009) (concluding that the motor homes at issue were being used for transportation purposes because the "motor homes were readily mobile," they "were not elevated on blocks, nor were they attached to utilities," they "were licensed," and "the campsite where they were parked was adjacent to a public road").

325, 327–28 (1990)). Here, considering the circumstances, police reasonably believed that an individual may be in the motor home that might pose a danger to them or others based on the 911 caller's report that four to five people were inside the motor home. Therefore, a protective sweep was permitted.

Defendants concede that the Fourth Amendment permits a protective sweep, citing *Maryland v. Buie*, 494 U.S. 325 (1990). Defendants' challenge, however, is that the sweep was too broad. Specifically, Defendants contend that the officers' sweep constituted a "full-blown" search of "every nook and cranny," lasting ten minutes. (Defs.' Mem. 15–16.) The Government argues the protective search was justified. (Gov't. Mem. at 33–36.)

Motor homes, in particular, provide the space where people can hide and pose a risk of harm. The Eighth Circuit has held that a protective sweep of a motor home extends to any area "large enough to hide a person." *United States v. Coleman*, 700 F.3d 329, 337 (8th Cir. 2012); *see also Alatorre*, 863 F.3d at 815 (holding that a protective sweep must be "initially confined to places large enough to conceal a person") (quotations omitted). The protective sweep "may extend only to a cursory inspection of those spaces where a person may be found" and must be "quick and limited." *Alatorre*, 863 F.3d at 815. In addition, "[d]uring a properly limited protective sweep, the police may seize an item that is in plain view if its incriminating character is immediately apparent." *United States v. Green*, 560 F.3d 853, 856 (8th Cir. 2009) (quotations omitted). "For an item's 'incriminating character' to be 'immediately apparent,' the officer must have probable cause to associate it with criminal activity." *United States v.*

*Arredondo*, 996 F.3d 903, 907 (8th Cir. 2021).

Here, the officers moved in single file from front to back and back to front. Their sweep lasted approximately three minutes, which included looking in closets, a space under the bed, and inside a shower. After the sweep, the officers spent approximately four minutes discussing the folded tinfoil, the money counter, and the cash Officer Smith had noticed sticking out of Thompson's purse in plain view. The officers did not touch the money counter or the purse. Officer Arbuckle, however, did pick up the tinfoil package and unfolded it, discovering what he suspected was drug residue.

Contrary to Defendants' claims, this Court's review of the bodycam footage does not show officers opening luggage or any other space too small to conceal a person during the protective sweep. At most, the officers flip up a bed to look beneath it, but this action has been held to fall within the scope of a protective sweep. *See, e.g.*, *Coleman*, 700 F.3d at 337 ("The district court found that the space under the bed was large enough to hide a person, and the sweep justifiably could extend to this area for the officer's protection from a possible hidden assailant."). It was also permissible for the officer to check under the stack of luggage because, as Officer Smith testified, somebody could have been hiding under the luggage. (Tr. 84.)

In addition, the time taken for the protective sweep was limited, lasting about three minutes, not ten minutes as Defendants argue. *See Alatorre*, 863 F.3d at 815 ("Finding no one inside, the sweep lasted only around two minutes, which was no more than was necessary to ensure the officers' safety."); *cf. United States v. Green*, 9 F.4th 682, 692–93 (8th Cir. 2021) (concluding the scope of the protective sweep of the defendant's

apartment violated the Fourth Amendment because the sweep "lasted around ten minutes and included looking inside kitchen cupboards, trash cans, and even inside a shoebox"). And the only items at issue that were discovered by police—the purse, the money counter, and the tinfoil—were in plain view. Except for the tinfoil, none of these items were searched. As for the tinfoil, because of D.M.'s behavior, Bigbee's behavior, and the 911 report of narcotic activity, Officer Arbuckle—who testified that tinfoil is "often used to not only hold or conceal narcotics" but also to "smoke or ingest" them, (Tr. 106)—had probable cause to immediately associate the folded tinfoil with criminal activity and thus was justified in opening it and seizing it. *See Arredondo*, 996 F.3d at 907.

Finally, when Officer Smith spotted Thompson's purse and stooped to view it with his flashlight, he did not, as Defendants argue, violate the Defendants' Fourth Amendment rights because he did not open the purse or seize it; he only observed what he could see in plain view. *See*, *e.g.*, *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (concluding the scope of police's protective sweep was permissible where, during the protective sweep, an officer opened a closet and, in plain view, "observed an open black bag with a scale, some currency, and a clear plastic bag with white powder in it").

For these reasons, this Court finds that the protective sweep was justified and the items seized that were observed in plain view during the protective sweep should not be suppressed.

**4. Whether the police had probable cause to search the motor home and whether D.M. consented to the search**

Having found that the automobile exception applies and the police's protective sweep was justified, this Court next considers whether the police had probable cause to search the motor home.[7] And, even if probable cause was in some way lacking, this Court considers whether the search was justified nonetheless based on D.M.'s consent to search.

i. *Probable Cause*

"Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016). Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quotations omitted). "Probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *Id.* (quotations omitted). Law enforcement officers are given "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013) (quoting *United States v. Henderson*, 613 F.3d 117, 1181 (8th Cir. 2010)).

---

[7]    As discussed above, the automobile exception does not dispense with the need for police to have probable cause before searching a vehicle, only the need to seek a warrant. *See Carney*, 471 U.S. at 392.

Here, before the officers entered the motor home again after the protective sweep, sufficient facts indicated that the motor home contained contraband or evidence of criminal activity. First, they had received a tip from a 911 caller who "suspected drug use and narcotics-related activity." The suspicious behavior by Bigbee and D.M., and the piece of folded tinfoil noted by Officer Smith, corroborated the information provided by the caller. *United States v. Roberts*, 787 F.3d 1204, 1211 (8th Cir. 2015) (holding that an anonymous tip provided probable cause to arrest defendant because it was "corroborated by independent police investigation"). Further, when the officers arrived at the motor home, D.M—who Officer Smith recognized as one of the "meth heads" he had dealt with in a previous encounter—began to behave oddly by stalling or not answering each time the officers asked about the names of the people inside the motor home, misdirecting the officers' attention toward the cars in the driveway, and telling police it was "probably not good that you go in [the motor home]." (Gov't. Ex. 7 at 05:25:05–55.) D.M. also would not let police talk to Bigbee inside the motor home but instead went inside himself and, on his way back out, shut the door and kept it shut by pressing his hand against it, preventing the officers from seeing and talking to Bigbee while Bigbee dug around inside. "Evasive behavior, while not alone dispositive, is another fact supporting probable cause." *United States v. Jones*, 535 F.3d 886, 891 (8th Cir. 2008); *see also United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) ("[Defendant's] evasive behavior at the hotel buttresses the probable cause finding.").

Moreover, the officers learned that the man inside the motor home was Bigbee and that Bigbee had an outstanding drug felony warrant. *United States v. Sumpter*, 669 F.2d

1215, 1222 (8th Cir. 1982) ("[A]n individual's prior criminal activities and record have a bearing on the probable cause determination."); *see also United States v. Short*, 2 F.4th 1076, 1081 (8th Cir. 2021) (concluding, in part, that the defendant's "criminal history" helped establish probable cause).

Providing further basis that police would find contraband inside the motor home was Bigbee's behavior. Police called for Bigbee to exit so they could talk, but Bigbee refused to exit the motor home and instead "nervously walk[ed] around." (Tr. 145); *see United States v. Wright*, No. 17-cr-03011 (WMW/DTS), 2018 WL 3696590, at *3 (D. Minn. Aug. 3, 2018) (noting that the defendant's refusal to exit his vehicle, combined with his observed nervousness along with his previous suspicion of drug activity provided part of the basis of the Court's finding of probable cause to search the defendant's vehicle). Then Bigbee, in a "hurried manner" and "quickly, "picked up a bag" and "proceeded to put something inside the bag." (Tr. 145–46.) Finally, when Officer LeBaron called out to other officers to describe what Bigbee was doing, Bigbee stopped, walked up to the front where the officers were shining their flashlights, and pulled the curtains on the passenger window, the front windshield, and the driver's window, completely concealing his activity from all sides. These furtive actions—in context with the circumstances already observed and knowledge learned—provided additional support for police's suspicions that contraband was inside the motor home. *See United States v. Andrews*, 381 F. Supp. 3d 1044, 1065 (D. Minn. 2019) (finding that officers had probable cause to search vehicle in part based on defendant's "furtive movements at the time of the stop"); *see also United States v. Flannigan*, No. 08-167

(DWF/FLN), 2008 WL 3538716, at *2–3 (D. Minn. Aug. 11, 2008) (finding probable cause that a gun was associated with criminal activity in part where an officer "shine[d] a light inside" the vehicle and observed the defendant "making furtive movements with his right arm, as if he were handing something off to the passenger or pushing something away from him," which the officer suspected was an effort to "conceal something").

The discovery of narcotics-related items during the protective sweep also supports that there existed a fair probability that contraband or evidence of a crime would be found inside the motor home. This includes the money counter and a wad of cash sticking out of a purse – which Thompson later revealed amounted to about $20,000 in rubber-banded bundles of cash, an amount Officer Smith found suspicious because drug trafficking is a cash business. *See United States v. Zamora-Garcia*, 831 F.3d 979, 985 (8th Cir. 2016) ("We previously have found probable cause to search for contraband based in part on the presence of a large sum of cash in a vehicle's console" because "large sums of cash are indicative of the drug trade.") (quotations omitted); *see also United States v. Reyes*, No. 11 CR. 58 RJH, 2012 WL 363042, at *8 (S.D.N.Y. Feb. 1, 2012) (finding probable cause in part where police discovered the defendant had purchased "a money-counter, a tool commonly used in the drug trade"). Also found were paraphernalia associated with the consumption of drugs, including Thompson's glass bubble pipe in her purse with suspected methamphetamine residue, a THC vape cartridge, and a piece of folded tinfoil lying in the motor home's entry that contained suspected drug residue.[8] *See*, *e.g.*, *United*

---

[8]     Officer Smith also observed evidence of potential narcotics activity in the form of suspected paraphernalia when he noticed a folded piece of tinfoil, outside of its cardboard

*States v. Gonzalez–Rodriguez*, 239 F.3d 948, 950–51 (8th Cir. 2001) (finding that the

discovery of a crack pipe and foil with methamphetamine residue in part established

probable cause).

These facts demonstrate that there existed a fair probability that contraband or

evidence of a crime would be found inside the motor home. Thus, this Court—having

found that the automobile exception applies and the protective sweep was justified—

concludes that the police had probable cause to search the motor home.

    ii.   *D.M.'s Consent*

Even if the police lacked probable cause—which this Court does not find—the

police still obtained valid consent from D.M., the owner, to search the motor home. "[A]

vehicle search pursuant to voluntary consent from a third party with authority over the

vehicle does not violate the Fourth Amendment." *United States v. Chavez Loya*, 528 F.3d

546, 554 (8th Cir. 2008). This voluntary third-party consent arises in one of two ways:

> Valid third party consent can arise either through the third party's actual
> authority or the third party's apparent authority. A third party has actual
> authority to consent to a search if that third party has either (1) mutual use
> of the property by virtue of joint access, or (2) control for most purposes . .
> . . [A] third party has apparent authority to consent to a search when an
> officer reasonably, even if erroneously, believes the third party possesses
> authority to consent.

*Id.* (citation omitted). In determining whether D.M., a third party, had such authority, "the

---

box, lying on the floor in the entry way of the motor home, folded up in many different
folds, which he found to be "extremely common for narcotics packaging and/or use of
narcotics." *See United States v. Goff*, 449 F.3d 884, 886 (8th Cir. 2006) (noting that
"aluminum foil" is one of the many "common elements used in the manufacture of
methamphetamine").

relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that [the third party] had authority over the vehicle." *Id.* (quotations and citation omitted).

Here, the facts known to police included that D.M. was the registered owner of the motor home, a fact that is undisputed by the parties. Police also observed D.M. freely entering and exiting the motor home several times before they arrived, and D.M. told police multiple times that the motor home was his. (Tr. 25–26; Gov't. Exs. 7 at 05:28:07; 8 at 05:32:06; 12 at 06:20:47.) Thompson also told police that D.M. was the owner of the motor home. (Gov't. Ex. 7 at 06:07:14.) These facts demonstrate that D.M. had actual and apparent authority to consent to the search. *See United States v. Booker*, 186 F.3d 1004, 1006 (8th Cir. 1999) ("The owner of a vehicle may consent to its search despite the presence of other occupants in the vehicle."). His consent extended not only to the living area of the motor home but to the motor home in its entirety when he told officers that they could "just go ahead and do whatever . . . ." when it came to searching the rest of the motor home outside the living area. (Gov't. Ex. 12 at 06:39:03.)

Defendants argue that D.M. had no authority to consent to the search because Bigbee and Thompson were essentially "overnight guests, tenants or like guests in a hotel room." (Defs.' Mem. at 17.) Defendants cite various cases to support their argument that since a landlord or hotel clerk cannot consent to a search of a premise occupied by either a tenant or guest, neither could D.M. consent to a search of the motor home where Bigbee and Thompson were staying. (*Id.*) But the facts here show that D.M. did not tell police that Bigbee was living in the motor home, only that he had been letting Bigbee fix it up

for him because Bigbee was his mechanic. (Gov't. Exs. 8 at 05:37:40; 12 at 06:20:50–06:22:10.) In fact, when Officer Arbuckle asked D.M. if Thompson and Bigbee were "just using [the motor home]," D.M. corrected him and said, "no, [Bigbee's] working on it." (Gov't. Ex. 12 at 06:20:50.) Because police knew D.M. owned the motor home and Bigbee was merely fixing it for D.M., it was reasonable for the officers to conclude that D.M. had authority to consent to search the motor home. *See United States v. Hill*, No. 17-1831 (PAM/LIB), 2017 WL 8944019, at *10 (D. Minn. Oct. 16, 2017), *report and recommendation adopted*, No. 17-183 (PAM/LIB), 2017 WL 5611560 (D. Minn. Nov. 21, 2017) (finding it was reasonable for officers to conclude a woman had authority to give consent to search a van because, in part, she was the registered owner of the van and she did not tell the officers that the van belonged to the defendant).

For these reasons, this Court concludes that even if the police did not have probable cause to search the motor home, their search was not unlawful because they obtained consent from a third party with authority over the motor home. Therefore, Defendants' motions to suppress, to the extent that they relate to the search of the motor home (and the subsequent search warrant for the search of the motor home), should be denied.[9]

---

[9]     Defendants argue that because the subsequent search warrant for the search of the motor home included facts obtained during the protective sweep and the search that followed, and because the sweep and the search violated their Fourth Amendment rights, the subsequent search warrant is invalid as fruit of the poisonous tree. For the reasons stated above, the protective sweep and search did not violate Defendants' rights. Therefore, Defendants' fruit-of-the-poisonous-tree argument fails.

### B.   Whether the evidence seized from the Dodge Ram truck and from Defendant Bigbee's residence should be suppressed

The Court next turns to Defendant Bigbee's separate motion to suppress evidence from the Dodge Ram and the Richfield residence. (Doc. No. 78.) As referenced above, based on information from their investigation into the ATM theft and from evidence observed through the windows of the Dodge Ram truck parked at the storage yard, officers obtained search warrants to seize and search the Dodge Ram truck. And based on evidence recovered from that search, as well as other evidence from the investigation, officers then obtained a search warrant to search Defendant Bigbee's residence. Defendant Bigbee argues that all evidence seized as a result of these search warrants should be suppressed because the search warrants contained facts learned when the

---

Furthermore, even if there was an issue with the probable cause showing in the subsequent search warrant, this was a facially valid warrant, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). This Court concludes that the good-faith exception would apply to the motor home search warrant. There is no evidence to suggest that the officer's reliance on the warrant was not in good faith, nor is there evidence that the officer's reliance was not reasonable. Therefore, for this additional reason, the evidence seized as a result of the execution of the motor home search warrant should not be suppressed.

officers entered and made observations at the storage yard, including what they observed

through the truck's windows in plain view, and argues that the police violated his Fourth

Amendment rights when they entered the storage yard without a warrant. (Defs.' Mem.

20–24.) In response, the Government argues that the officers did not violate his Fourth

Amendment rights because Bigbee did not have an expectation of privacy in the storage

yard and that, even if he did, the officers received consent from Mr. Brenner, the

manager/caretaker of the storage yard. (Gov't. Mem. at 17–24.)

### 1. Whether Bigbee had a reasonable expectation of privacy in the storage yard

Bigbee argues he had a reasonable expectation of privacy in the storage yard

where the Dodge Ram truck was parked. "An individual asserting Fourth Amendment

rights 'must demonstrate that he personally has an expectation of privacy in the place

searched, and that his expectation is reasonable.'" *United States v. Russell*, 847 F.3d 616,

618 (8th Cir. 2017) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir.

2004)). "The defendant moving to suppress bears the burden of proving he had a

legitimate expectation of privacy that was violated by the challenged search." *Id.*

(quotation omitted). "If a defendant fails to prove a sufficiently close connection to the

relevant places or objects searched he has no standing to claim that they were searched or

seized illegally." *Id.* (quotation omitted).

"Whether a police officer has commenced a 'search' turns not on his subjective

intent to conduct a search and seizure, but rather whether he has in fact invaded an area

which the defendant harbors a reasonable expectation of privacy." *United States v. Reed*,

733 F.2d 492, 501 (8th Cir. 1984) (finding a police officer's initial entry into business parking lot was not a search where the lot was bordered by public streets on two sides and visible from public streets on two sides, plus the fenced gate was completely open to the public and shared by two separate businesses). In *Reed*, the Eighth Circuit recognized that no Fourth Amendment search occurs when police officers enter private property and restrict their movements to areas generally made accessible to visitors. *Id.*

For example, in *United States v. McGrane*, the Eighth Circuit rejected a generalized expectation of privacy in the common areas of an apartment building. 746 F.2d 632, 634–35 (8th Cir. 1984). There, an officer investigating a suspicion of drug manufacturing, entered the basement of a four-unit apartment building "through an unlocked door and discovered four storage lockers, each marked with the number of an apartment in the building." *Id.* at 633. "The walls of the lockers were constructed of board slats spaced one to two inches apart." *Id.* Inside the storage unit associated with the defendant, the officer observed "approximately twelve containers labeled by various chemical companies." *Id.* The defendant later contended that the "inspection of the storage locker violated his fourth amendment rights." *Id.* at 634. The Eighth Circuit concluded that because the basement area of the apartment building "constituted a common area of the building, accessible to all tenants and the landlord," the defendant "did not have an expectation of privacy extending into the basement and the visual inspection of a storage locker in this area did not violate the fourth amendment." *Id.*

Here, Bigbee has not established a reasonable expectation of privacy in the storage yard. The Dodge Ram truck[10] was situated in an open-air lot, with no covering, containers, walls, or other enclosures to obstruct the view of the truck from anyone on the storage yard. The gate attached to the fence that surrounded the entire yard was open when Detective Piper and the officers arrived. The storage yard was used by multiple people, including Steve Brenner's hauling business, the business's owner, and any number of people who might store any property there. And a plain view of the interior of the Dodge Ram truck was open to anyone who entered the yard and wished to look through the windows. A defendant cannot have a legitimate expectation of privacy of items in plain view inside a vehicle. *See Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.") (citations omitted); *New York v. Class*, 475 U.S. 106, 114–15 (1986) (explaining that locations inside a vehicle that are in plain view of people outside the vehicle are not "subject to a reasonable expectation of privacy"); *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (explaining that a suspect with transparent windows did not have a reasonable expectation of privacy in the "visible interior of his car").

---

[10]    As the Government points out, it is not clear from the record or from Defendants' arguments that Bigbee had a possessory or property interest in the truck. (Gov't. Mem. at 21.) Generally, a person lacks standing to challenge a vehicle search "where he has neither a property nor a possessory interest in the automobile." *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017). That said, the Court addresses whether Bigbee had a reasonable expectation of privacy due to the storage of the vehicle on the lot.

Because Defendant Bigbee did not have a reasonable expectation of privacy in the storage yard, law enforcement's peek into the Dodge Ram truck's windows did not violate Bigbee's Fourth Amendment rights.

### 2. The manager/caretaker provided consent to allow police on-site

Even if Defendant Bigbee did have a reasonable expectation of privacy in the storage yard, the police obtained consent from Mr. Brenner to enter. The Fourth Amendment permits "a valid warrantless search of a premises when officers obtain the voluntary consent of an occupant who shares authority over the area in common." *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009); *see also United States v. Matlock*, 415 U.S. 164, 171 (1974) (stating that the consent of a third party who "possesse[s] common authority over" the premises or effects to be searched or who has a "sufficient relationship to the premises or effects" is enough to authorize a warrantless search). "Common authority is a question of fact determined by the existence of mutual use, joint access, and control." *Nichols*, 574 F.3d at 636 (quotations omitted).

Though Mr. Brenner was not the owner of the storage yard, he was the manager/caretaker of the yard. His business was located on it. He had physical access to the lot. And he was familiar with its customers who stored items there, including D.F. and Bigbee. The record therefore establishes that Mr. Brenner had joint access, control, and use of the yard such that he exhibited common authority over it. Any warrantless search of its premises would be considered valid with his consent.

Accordingly, the entry onto the storage yard and observations made by the officers and later used to support probable cause in the search warrant applications for the Dodge

Ram truck and for Bigbee's residence, did not violate Defendant Bigbee's Fourth Amendment rights. Therefore, his motion to suppress should be denied.

### 3. The *Leon* good-faith exception applies

Finally, even if the facts referenced in the search warrants were somehow tainted by an unauthorized entry into the storage yard, the good-faith exception to the exclusionary rule applies to each of these warrants. The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Leon*, 468 U.S. at 906 (quotations omitted). Determining whether evidence obtained from a warrant should be suppressed is determined on a case-by-case basis. *Id.* at 918. In *Leon*, the Supreme Court held that when evidence is obtained by officers reasonably relying on a search warrant, the good-faith exception to the exclusionary rule may apply. *Id.* at 922–23. Under the good-faith exception, "disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008) (internal citation omitted). "[T]he fact that a neutral [judge] has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal quotation omitted). "[T]he threshold for establishing [that the *Leon* exception does not apply] is a high one, and it should be." *Leon*, 468 U.S. at 923. "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the

detectives' prewarrant conduct must have been close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013). "If the officers' prewarrant conduct is clearly illegal, the good-faith exception does not apply." *Id.* (quotations omitted).

Here, the officers' actions were not clearly illegal. They had been given consent to walk onto the storage lot from Mr. Brenner. Mr. Brenner was the manager/caretaker who ran his business on the lot. The name of his company appeared at the address. And he had an office on the lot from which he worked. Based on this, the officers had an objectively reasonable belief that Mr. Brenner's consent gave them authority to enter the storage lot without a warrant. Thus, the officers had an objectively reasonable belief that their entry and observations did not violate the law, and that the inclusion of the information they learned through their investigations into the subsequent search warrants would not violate Defendant's rights. "To trigger the exclusionary rule," the law enforcement conduct "must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Here, exclusion "would only serve to punish a police officer for relying on a neutral judge's conclusion that the warrant[s were] sufficiently particular." *United States v. Harris*, No. 20-cr-98 (SRN/TNL), 2021 WL 3929270, *5 (D. Minn. Sept. 2, 2021); *see also Leon*, 468 U.S. at 921 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."). Therefore, this Court finds that the good-faith exception in *Leon* applies, and the

evidence seized pursuant to the warrants for the Dodge Ram truck and Bigbee's residence should not be suppressed.

## RECOMMENDATION

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1.    Defendant Thompson's Motion to Suppress Evidence as a Result of Search and Seizure (Doc. No. 39) be **DENIED**;

2.    Defendant Bigbee's First Motion to Suppress Evidence (Doc. No. 43) be **DENIED**; and

3.    Defendant Bigbee's Second Motion to Suppress Evidence (Doc. No. 78) be **DENIED**.


Date:  November 9, 2021

                                                          *s/ Becky R. Thorson*
                                                          BECKY R. THORSON
                                                          United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **November 23, 2021**. A party may respond to those objections by **December 7, 2021**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.