UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Crim. No. 21-60 (JRT/BRT) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Andrew Jerome Bigbee, | |
| Defendant. | |

---

Nathan H. Nelson, Esq., United States Attorney's Office, counsel for Plaintiff.

Daniel P. Repka, Esq., Repka Law, LLC, counsel for Defendant Bigbee.

---

BECKY R. THORSON, United States Magistrate Judge.

On May 19, 2022, Defendant Andrew Jerome Bigbee was indicted via a Superseding Indictment on an additional count of possession with intent to distribute a controlled substance in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (Doc. No. 122, Superseding Indictment.) This case is before the Court on Defendant's Third Motion to Suppress Evidence in which Defendant challenges the probable cause for the search warrant used to search of his residence on May 6, 2021. (Doc. No. 125.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. This Court held a motion hearing on August 15, 2022, and received five exhibits into evidence as well as testimony from Officer Paul Stenglein. (*See* Doc. Nos. 137, 138.) For the reasons stated below, this Court recommends that Defendant's motion be denied.

## BACKGROUND

On April 28, 2021, Drug Enforcement Agent ("DEA") Task Force Officer Anthony Fletcher applied for an anticipatory search warrant in state court to search the following described premises: "[XXXX] Main Street, Elko, MN located in Scott County," including the single family residence as well as "all attached or detached outbuildings, garages, storage sheds and vehicles on the property." (Doc. No. 138, 8/15/22 Hr'g Ex. List, Hr'g Ex. 13.) The warrant allowed for the search for the following property and things:

> Illegal narcotics (specifically crystal methamphetamine), drug paraphernalia, US Currency that is the proceeds of the sale of controlled substances; Safes, lockboxes or other storage devices which may contain proceeds from drug sales, drug notes or other items which tend to show narcotics trafficking; Scales, weighing and packaging equipment; Firearms, ammunition and weapons that are used to protect controlled substances and the proceeds from the sales; Writings and mailings that indicate occupancy and constructive possession; Drug notes and "owe sheets" that indicate co-conspirators; Cellular phones, land-line phones, caller ID'nd pagers that are used to facilitate drug trafficking; Access to the data stored on cellular devices; Address and phone books that would identify co-conspirators; Books, papers, documents, calendars, photographs, ledgers, bank statements, and other financial documents used to obtain, transfer, or conceal monies from drug trafficking; Sales receipts for items purchased with currency; Computers, programs, storage disks, and all related documents evidencing the storage and distribution of controlled substances; Access to the data stored on computer equipment; Equipment, paraphernalia and other items used for ingesting or selling controlled substances.

(Hr'g. Ex. 13.)

Officer Fletcher provided the following facts supporting the issuance of the April 28, 2021 warrant in his affidavit:

2

Since April of 2021, your affiant and other officers from DEA Task Force Group 1 have been investigating the drug trafficking of Andrew Jerome BIGBEE DOB: [XXXXXXXX] 1966. Your affiant learned that BIGBEE resides at [XXXX] Main Street, Elko, MN (Scott County).

In the past 10 day period, your affiant and other officers were conducting surveillance on BIGBEE as he was driving a White BMW SUV. During this surveillance, BIGBEE conducted counter surveillance measures such as running red lights, pulling into parking lots, pulling over for short periods, changing his driving speed and continuously switching lanes as surveillance officers attempted to follow his vehicle. Due to the manner in which BIGBEE was driving officers were unable to continue surveillance. Your affiant knows from training and experience that persons involved in this type of behavior are typically actively involved in illicit activity and are acting in such a manner as to avoid detection by law enforcement. This activity occurred as BIGBEE approached the area of his residence in Elko, MN.

Your [affiant] spoke with TFO Mager who advised your affiant that BIGBEE was the target of a recent investigation by other DEA agents and a local drug task Force. Your affiant spoke with TFO Holter and SA Mathison (DEA) and learned that BIGBEE was recently indicted by a Federal grand jury in U.S. District Court in Minnesota for Federal drug trafficking crimes and has an outstanding Federal arrest warrant for his person in the District of Minnesota.

Your affiant conducted a criminal history check on BIGBEE and learned that he has an extensive arrest and conviction history involving narcotics, weapons, assaults, fleeing police, burglary, arson and other crimes.

In the past 72-hour period, your affiant spoke with Detective Fordice of the Southwest Hennepin Drug Task Force and learned that in October of 2020, BIGBEE and two coconspirators were arrested together in an RV in Bloomington, MN. A search warrant was obtained for the RV and law enforcement seized 12.34 pounds of methamphetamine and $319,790.00 in U.S. Currency (drug proceeds).

Your affiant learned that in December of 2020, local law enforcement went to the residence and located stolen vehicles and learned that BIGBEE was present at the time of those police contacts and refused to cooperate with law enforcement. In December of 2020, BIGBEE fled law enforcement while in a vehicle in the City of Oakdale, MN.

3

Your affiant has driven by the residence and observed BIGBEE in the driveway of the residence between the house and an exterior outbuilding. As your affiant drove by, BIGBEE watched until your affiant was out of eyesight of the residence. Your affiant also observed an F 350 registered to BIGBEE at the residence along with a white BMW SUV used by BIGBEE at the residence. Your affiant also observed security cameras on the exterior front of the residence.

Your affiant knows that the use of traditional investigative measures (such as surveillance, trash pulls, traffic stops and dog sniffs) typically used by investigators would prove unfruitful due to the high level of security and counter surveillance measures being used by BIGBEE. The attempted use of those measures would further alert BIGBEE to the presence of Law Enforcement. This would limit the ability of law enforcement to effectively investigate BIGBEE and his co-conspirators and hinder Law Enforcement's ability to identify additional components of his sophisticated drug trafficking operation. Your affiant knows that BIGBEE is involved in the collection and smuggling of bulk currency gained as the result of the sale of controlled substances, specifically methamphetamine and is utilizing the residence located at [XXXX] Main Street, Elko to facilitate this activity.

Your affiant is requesting permission from the court to execute an anticipatory k-9 dog sniff search warrant as Law enforcement accesses the curtilage of the property located at [XXXX] Main Street Elko, MN. This will allow for a certified police narcotics detecting canine (K9) team recognized by the United States Police Canine Association to conduct a K9 sniff of the threshold of the doors to the residence once on site. This activity would occur simultaneously as Federal Law Enforcement officers would be attempting to execute the Federal arrest warrant for BIGBEE's person. If the k9 does not indicate, agents will not execute the corresponding warrant.

Your affiant is aware, through training and experience, that drug transactions most frequently involve cash, which is consistent with this investigation. Because of the illegal nature of the transactions, those dealing controlled substances do not report that income on their income tax returns. The money earned by a drug dealer through drug sales is often revealed through deposits of cash into savings or checking accounts, or other cash type accounts. Those profiting from illegal drug activities frequently use their money for such items as real property, stocks, bonds, jewelry or other gems. By seizing records or documentation as to financial worth, law enforcement and tax agents can compare one's lifestyle with one's reported income to determine whether the reported income accurately reflects the

> earned income. Through training and experience, your affiant has learned that people involved in using and/or dealing controlled substances often keep in their residence records as to their drug transactions. These records often contain customer lists, price lists, source supply and notes with mathematical figures relating to drug transactions. Your affiant has also found during investigations that people often use garages, outbuildings, storage lockers and vehicles, in addition to their residences, to store, hide or conceal evidence of their involvement in drug trafficking.
>
> Your affiant has found that people who buy, sell and/or possess controlled substances commonly use devices such as lock boxes, fire-safe boxes, safes and other containers to store, conceal or protect their controlled substances and/or money derived from the sale of illegal drugs. Your affiant has found that people store illegal narcotics in their vehicles to avoid detection in case of a search inside the house. Your affiant has also found that persons involved in drug trafficking often store the records mentioned above in these containers, as well as paraphernalia related to drug use and sales. Your affiant knows through training and experience that people involved in drug use, possession, and trafficking often use cellphones, telephones, and electronic devices to help facilitate their drug transactions.
>
> Based on the above information, your affiant knows that Andrew Jerome BIGBEE DOB: [XXXXXX] 1966, has an outstanding Federal arrest warrant for his person for Federal drug crimes, and believes he is in possession of illegal drugs and/or currency derived from the sale of illicit narcotics and that those items along with BIGBEE are present at the address located at [XXXX] Main Street, Elko, MN. Therefore, your affiant respectfully requests an anticipatory "day time" search warrant predicated on a positive drug canine alert on the exterior doors of the residence, be granted for the residence to search for the items listed within the scope this warrant.

(Hr'g Ex. 13.) The search warrant issued on April 28, 2021. (*Id.*)

On May 6, 2021, officers arrived at the [XXXX] Main Street residence to execute a federal warrant for Defendant's arrest. (Doc. No. 145, 8/15/22 Hr'g. Transcript ("Tr.") 30.) Officers announced their presence, and, after several minutes, Defendant Bigbee and Co-Defendant Danielle Thompson exited the front door and were placed under arrest. (Tr. 31–32.) Following the arrest, a protective sweep of the residence was performed. (*Id.*

5

at 32.) Once the residence was determined to be secure, Officer Paul Steinglein, a canine officer, and Kirk, a drug detecting canine certified by the United States Police Canine Association, proceeded to the northeast corner of the residence near the residence's east-facing door. (*Id.* at 33, 35.) Officer Stenglein gave Kirk the command to search for drugs. (*Id.* at 35.) As Kirk approached the east-side door, Officer Stenglein observed his breathing become heavy and his tail began to wag. (*Id.* at 36.) According to Officer Stenglien, this indicated Kirk was "starting to get in an odor of narcotics." (*Id.*) Once Kirk sniffed the door of the residence, he immediately sat, indicating a "positive alert" for the "odor of narcotics." (*Id.*) Officer Stenglein stated there was no ambiguity to his alert and that Kirk did not "need to think about it very long before alerting."[1] (*Id.*)

After Kirk's alert, Officer Stenglein informed the other officers that Kirk had indicated the odor of drugs. (*Id.* at 38.) Pursuant to the warrant, the police conducted a search of the house. (*Id.*) The search revealed methamphetamine, cellphones, and other evidence, which the Government states forms the basis of Count 4 in the Superseding Indictment.

## DISCUSSION

Defendant seeks to suppress all evidence collected from the May 6, 2021 search of [XXXX] Main Street in Elko, Minnesota. (*See generally* Doc. No. 153, Def.'s Mem. of Law in Supp. of His Third Mot. to Suppress Evid. ("Def.'s Mem.").) He argues the search-warrant application failed to establish probable cause and that the good-faith

---

[1] Officer Stenglein also testified at the hearing that he did not do anything to prompt or cue Kirk to sit. (Tr. 36.)

exception established under *United States v. Leon*, 468 U.S. 897 (1984), does not apply. The Government opposes. (*See generally* Doc. No. 154, Mem. in Opp'n to Def.'s Third Mot. to Suppress ("Gov't Mem.").)

### I. Probable Cause

Defendant challenges the probable cause underlying the April 28, 2021 warrant and requests a four-corners review. The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.") (quotations omitted). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003)

(quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exist[s].'" *United States v. Oropesa*, 316 F.3d 762, 767 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987).

In the present case, Defendant argues that the search-warrant application fails to connect the [XXXX] Main Street property in Elko to any contraband or contemporaneous illegal activity.[2] As noted above, the warrant included an anticipatory dog sniff in which a certified police narcotics detecting canine ("K9")—recognized by the United States Police Canine Association—would conduct a K9 sniff of the threshold of the doors to the residence once on site. (Hr'g. Ex. 13 at 4.) The warrant authorized the search of Defendant's residence if and only if the certified drug detection canine made a positive indication to the odor of drugs at the exterior door of the residence.

---

[2]   In his brief, Defendant mentions that the search warrant failed to establish a nexus between his residence and *the illegal activity*. (*See, e.g.*, Def.'s Mem. 6 ("[N]othing in SA Fletcher's search-warrant application alleges illegal activity or suspicious activity at [XXXX] Main Street in Elko.").) However, the proper legal standard here is whether there exists a nexus between *the evidence* being sought and the place to be searched. *See, e.g.*, *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009) ("The nexus required by the Fourth Amendment, however, is that between the contraband being sought and the place to be searched.") (quotations and alterations omitted); *see also United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) ("[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue.").

8

When an anticipatory warrant[3] involves a dog sniff, the supporting affidavit "need only state the dog has been trained and certified to detect drugs . . . An affidavit need not give a detailed account of the dog's track record or education." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (quotations omitted). Here, the affidavit stated that a "certified police narcotics detecting canine (K9) team recognized by the United States Police Canine Association" would "conduct a K9 sniff of the threshold of the doors to the residence once on site." (Hr'g. Ex. 13 at 4.) During the execution of the warrant, Kirk, a narcotics detecting canine certified by the United States Police Canine Association, positively indicated that drugs were present in the residence. This fact, standing alone, was sufficient to establish probable cause to search the property for contraband and other evidence of drug trafficking. *See, e.g.*, *Donnelly*, 475 F.3d at 955 (8th Cir. 2007) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, *standing alone*, gives an officer probable cause to believe that there are drugs present.") (emphasis added); *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999) (A drug "dog's positive indication *alone* is enough to establish probable cause for the presence of a controlled substance if the dog is reliable.") (citing cases) (emphasis added).

---

[3]   In an anticipatory warrant, the "[o]ccurrence of the triggering condition establishes the requisite connection between the item[s] described in the warrant and the searched location." *United States v. Brown*, 929 F.3d 1030, 1038 (8th Cir. 2019) (quotations omitted). As further explained, the triggering condition here was a trained dog's positive indication of drugs.

Defendant does not challenge the adequacy of Kirk's training program or certification.[4] Instead, he argues that the affidavit failed to establish Kirk's reliability because it did not include additional information about Kirk's training or performance record. In other words, Defendant argues that simply noting on an anticipatory warrant that a dog will be certified by the United States Police Canine Association, without more, is not "sufficient information to weigh the reliability of Kirk before signing off on the warrant." (Def.'s Mem. 9.) But the Eighth Circuit rejected this argument in *Sundby* where a defendant argued that the "[n]othing is offered in the affidavit . . . other than the dog is narcotics trained and certified. No information is offered about continued training, continued certification, reliability, or error rates for [the dog]." 186 F.3d at 874. There, the Eighth Circuit held that, to "establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education." *Id.* at 876.

---

[4]  Based on Officer Stenglein's testimony at the hearing and the Government's exhibits, Defendant "relents his second motion" questioning the validity of Kirk's positive indication for drugs. (Def.'s Mem. n.1.) As background, Officer Stenglein testified that he has been a canine officer for ten years and had worked with Kirk. (Tr. 10, 12–14.) Officer Stenglein explained the process of canine narcotics detection training and that Kirk had passed a test to become certified in drug detection by the United States Police Canine Association and was certified during the time of the search. (*Id.* at 12–28.) He also explained that he continued training Kirk after certification to keep him "fresh and keep him working, and that, in his training and experience, Kirk had been "[v]ery reliable" had historically been accurate with his alerts in the field "100 percent of the time." (*Id.* at 25–26, 39, 56–57.) The Government also introduced exhibits of Kirk's United States Police Canine Association annual certification as well as his training summary. (Hr'g. Exs. 16–17.)

10

Similar to *Sunby*, the affidavit here stated that a "certified police narcotics detecting canine (K9) team recognized by the United States Police Canine Association" would "conduct a K9 sniff." (Hr'g. Ex. 13 at 4.) This was sufficient information to establish Kirk's reliability. *See Sundy*, 186 F.3d at 876; *see also United States v. Abari*, No. 19-CR-10301 (MJD/ECW), 2020 WL 4727436, at *9 (D. Minn. Aug. 14, 2020) (finding that a dog's certification by the United States Police Canine Association was enough to presume that the dog's alert provided probable cause to search); *United States v. Ferguson*, No. 17-CR-204 (JRT/BRT), 2018 WL 582475, at *7 (D. Minn. Jan. 29, 2018) (same). Thus, because the information established Kirk's reliability, his subsequent positive indication of narcotics at the [XXXX] Main Street property in Elko provided probable cause to believe that drugs and other evidence of drug trafficking were present.[5]

In addition to the positive dog sniff, the affidavit also included information regarding Defendant's extensive arrest and conviction history involving narcotics and other offenses, namely that Defendant:

- was the target of a recent investigation by other DEA agents and a local drug task force;

- had recently been indicted by a Federal grand jury in U.S. District Court in Minnesota for Federal drug trafficking crimes;

- had an outstanding Federal arrest warrant for his person in the District of Minnesota;

---

[5]  Defendant cites to the Sixth Circuit case *United States v. Brown*, 828 F.3d 375, 384 (6th Cir. 2016), to support his argument that there lacked a nexus between evidence of contraband and Bigbee's residence. (Def.'s Mem. 6.) But not only is *Brown* not binding on this Court, it is factually distinguishable. Here, a narcotic detecting dog positively indicated the presence of drugs inside Bigbee's residence. In *Brown*, no dog-sniff was conducted at the defendant's residence. Thus, *Brown* is not persuasive.

11

- had an extensive arrest and conviction history involving narcotics, weapons, assaults, fleeing police, burglary, arson and other crimes;

- was found in October 2020 with over twelve pounds of methamphetamine in an RV along with $319,790.00 in suspected drug proceeds;

- had refused to cooperate with law enforcement in December 2020 when they arrived at the residence and located stolen vehicles; and

- had previously fled law enforcement.

(Hr'g. Ex. 13 at 3–4.) This information, in addition to the positive dog-sniff at Defendant's residence, provided additional support for the warrant's probable cause that illegal narcotics and other evidence of drug trafficking would be found at the property. *See, e.g.*, *United States v. Thurmond*, 782 F.3d 1042, 1045 (8th Cir. 2015) (holding that the defendant's criminal history with controlled substances supported, in part, a warrant's probable cause); *United States v. Kattaria*, 553 F.3d 1171, 1176 (8th Cir. 2009) (holding that probable cause supported the search warrant, in part, where the defendant had a prior criminal history of marijuana trafficking).

Moreover, the affidavit included information that Defendant kept security cameras on the exterior of his residence and had conducted counter surveillance maneuvers when officers attempted to follow his vehicle, including running red lights, pulling into parking lots, pulling over for short periods, changing his driving speed, and continuously switching lanes. (Hr'g. Ex. 13 at 3–4.) This conduct "occurred as [Defendant] approached the area of his residence in Elko, MN." (*Id.*) Officer Fletcher stated in his affidavit that, based on his training and experience, "persons involved in this type of behavior are typically actively involved in illicit activity and are acting in such a manner as to avoid

12

detection by law enforcement." (Hr'g. Ex. 13 at 3.) Defendant's counter-surveillance tactics near his residence—a residence where Officer Fletcher stated Defendant had been observed before and where his vehicles were parked—provided even further support for probable cause that evidence would be found inside the property. *See United States v. Duran*, 109 F. Supp. 3d 1093, 1102 (D. Minn. 2015) (holding, in part, that probable cause supported the search warrant of an apartment where officers believed an individual who had been inside the apartment was driving around conducting counter-surveillance maneuvers); *see also United States v. Bucks*, No. 06-CR-305 (DSD/JSM), 2006 WL 3611319, at *4 (D. Minn. Dec. 11, 2006) (citing counter-surveillance driving techniques as support for probable cause to support a search warrant of a residence).

In sum, because the affidavit included an anticipated positive alert from a certified drug detecting canine, as well as information regarding Defendant's extensive drug trafficking history and counter-surveillance behavior, this Court concludes that the affidavit indicated a fair probability that evidence of Defendant's drug trafficking would be found at the property and thus provided a proper nexus and sufficient probable cause for the search.

## II.   *Leon* Exception

Even if probable cause did not exist, the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662,

665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). The Court in *Leon* cited four circumstances in which the good-faith exception does not apply:

> (1) when there is a *Franks* violation; (2) when an issuing judge has "wholly abandoned his judicial role"; (3) when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (quoting *Leon* 468 U.S. at 923).

Here, Defendant does not request a *Franks* hearing and the other three circumstances highlighted by *Puckett* do not apply. *See id.* Instead, Defendant argues that the good-faith exception cannot apply because the affidavit did not establish the reliability of Kirk. But as discussed above, the affidavit, by stating that a narcotics detecting canine certified by the United States Police Canine Association would conduct a dog-sniff, provided sufficient reliability. *See Donnelly*, 475 F.3d at 955; *Sundby*, 186 F.3d at 875–76. Additionally, based on this Court's review, there is no evidence to suggest that the officers' reliance on the warrant was not in good faith, nor is there

evidence that the officers' reliance was not objectively reasonable. Thus, this Court concludes that the good-faith exception would apply to the search warrant.

## RECOMMENDATION

Based on the files, records, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that: Defendant Bigbee's Third Motion to Suppress Evidence (Doc. No. 125) be **DENIED**.

Date:  November 21, 2022

                                             *s/ Becky R. Thorson*
                                             BECKY R. THORSON
                                             United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **December 5, 2022**. A party may respond to those objections by **December 19, 2022**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.