UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-60(1) (JRT/DJF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| v. | ) | |
| | ) | |
| ANDREW JEROME BIGBEE, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Nathan H. Nelson and Chelsea A. Walcker, Assistant United States Attorneys, hereby respectfully submits its position and memorandum on sentencing.

## TABLE OF CONTENTS

**Background** …………………………………………………………………1

**Defendant's Objection – Weapons Enhancement**……………………….……….…3

**Defendant's Objection – Aggravating Role**…………………………………...8

**Defendant's Objection – 2D1.1(b)(16)**………………………………………13

**Government's Objection – Obstruction of Justice**……………………………18

**Position of Sentencing**……………………………………………….…..…23

## BACKGROUND

Following a five-day trial, a jury found the defendant Andrew Bigbee guilty of one count of conspiring to distribute 500 grams or more of methamphetamine (Count 1) and

four counts of possessing 500 grams or more of methamphetamine with the intent to distribute it (Counts 2-4), all in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846.

The Probation Office issued a Presentence Investigation Report ("PSR"). The PSR calculated a base offense level of 38, based on the defendant's involvement with at least 45 kilograms of methamphetamine mixture, or at least 4.5 kilograms of actual (pure) methamphetamine. (PSR ¶ 28). The PSR also concluded that the defendant's offense level should be: (1) increased by 2 levels pursuant to U.S.S.G. § 2D1.1(b)(1) because the defendant possessed a dangerous weapon (three firearms); (2) increased by 2 levels because the defendant met the criteria U.S.S.G. § 2D1.1(b)(16),[1] and (3) increased by 4 levels pursuant to U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of criminal activity involving five or more participants. (PSR ¶¶ 29-30, 32-33). Accordingly, the PSR calculated a total offense level of 46, which was reduced to level 43 by operation of the Guidelines' offense level cap. (PSR ¶¶ 34, 37). Combined with a criminal history category of III, the PSR calculated an advisory Guidelines range of life imprisonment. (PSR ¶¶ 58-60, 103-04). There is a mandatory minimum of fifteen years' imprisonment because the defendant committed the offense after having previously been convicted of a serious drug felony. (PSR ¶ 103).

The government objects to the PSR insofar as it fails to apply a separate 2-level upward adjustment based on U.S.S.G. § 3C1.1 for obstruction of justice. (*See* PSR ¶ 33; ECF 249 at 6). The defendant, for his part, has objected to (1) the 2-level enhancement for

---

[1] Or, in the alternative, because the defendant obstructed justice as described in U.S.S.G. § 3C1.1. (PSR ¶ 33).

possession of a dangerous weapon, (2) the 2-level enhancement under U.S.S.G. § 2D1.1(b)(16); and (3) the 4-level upward adjustment for being an organizer or leader of criminal activity under U.S.S.G. § 3B1.1. The government will address each of the parties' objections in turn then address the issue of the appropriate sentence.

## DEFENDANT'S OBJECTION – WEAPONS ENHANCEMENT

The defendant first objects to the application of the 2-level enhancement pursuant to USSG § 2D1.1(b)(1) for the offense involving the possession of a dangerous weapon, namely, three firearms. The United States believes application of this adjustment is appropriate and urges the Court to overrule defendant's objection.

### A.    Legal Standard for Application of USSG § 2D1.1(b)(1)

Section 2D1.1(b)(1) of the United States Sentencing Guidelines provides a 2-level enhancement in a drug case "[i]f a dangerous weapon (including a firearm) was possessed." The Application Notes to the Guideline state that the enhancement "reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense." *Id.*, cmt. 11(A) (emphasis supplied). For example, the commentary states the enhancement should not be applied if the defendant when "arrested at [his] residence, had an unloaded hunting rifle in the closet." *Id.*

The burden of proving the applicability of the dangerous weapon enhancement is on the government. *United States v. Peroceski*, 520 F.3d 886, 889 (8th Cir. 2008). The Eighth Circuit has held, however, that the "clearly improbable" standard under the Guideline poses "a very low bar" for the government to hurdle. *United States v. Ashburn*,

865 F.3d 997, 999 (8th Cir. 2017). The reduced standard of proof "supports the goals of the enhancement" by "discourag[ing] drug criminals from bringing weapons anywhere near their drugs." *United States v. Anderson*, 618 F.3d 873, 880 (8th Cir. 2010).

"Although the mere presence of a weapon is not enough, the government need not show the defendant used or even touched a weapon" to prove a connection between the weapon and the offense. *United States v. Garcia*, 703 F.3d 471, 476 (8th Cir. 2013) (internal citations omitted); *accord United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (per curiam)). The government need only prove, by a preponderance of the evidence, "'a temporal and spatial nexus among the weapon, defendant, and drug-trafficking activity.'" *United States v. Escobar*, 909 F.3d 228, 240 (8th Cir. 2018) (quoting *United States v. Torres*, 409 F.3d 1000, 1003 (8th Cir. 2005)). The nexus exists "when the weapon was found in the same location where drugs or drug paraphernalia were located or where part of the conspiracy took place." *United States v. Garcia*, 772 F.3d 1124, 1125 (8th Cir. 2014) (per curiam). The "well-known tendency of drug criminals to use firearms in connection with their drug activities supports an inference that a gun near the vicinity of drug activity is somehow connected to it." *Peroceski*, 520 F.3d at 889.

## B.    Application of the Enhancement

The evidence at trial, including the undisputed facts in the PSR, supports application of the enhancement, and shows it is not "clearly improbable" that the three firearms recovered in this case were connected to the drug trafficking offense.

The first two guns were found during the September 2019 search of the defendant's residence in Richfield, where he had lived for at least 10 years. (Tr. 514). The September

4

2019 search arose out of an investigation into an ATM theft. (PSR ¶ 9). Officers received information from a concerned citizen, who knew many non-public details about the theft, including the method used to commit the theft and the amount of money inside the ATM. (PSR ¶ 9). The concerned citizen reported that the defendant and an accomplice committed the theft and—most relevant here—also advised police that both men carried firearms and sold large amounts of drugs. (PSR ¶ 9).

Police executed the search warrant on September 4, 2019. (PSR ¶ 12). Although the defendant had several visitors at the house at the time the search warrant was executed, police officers had a long history of contacts with the defendant at his house and did not know anyone else to live at the address. (Tr. 517, 523). The house had both an attached and a detached garage, which were searched by police. In the attached garage, officers found 449 grams of methamphetamine in a duffle bag. (Tr. 520-21; Gov't Ex. 10). In the detached garage, officers found two firearms: a Glock 22 .40 caliber handgun and a Taurus Judge revolver. (Tr. 537-38; Gov't Ex. 3). In that same detached garage, officers also found several plates/bowls containing a total of about 76.55 grams of methamphetamine. (Tr. 537, 544-45; Gov't Ex. 2, 10). They also found $8,800 in cash, a currency counting machine, a scale, and packaging materials—all of which are closely associated with drug trafficking. (Tr 537, 547-48; Gov't Ex. 6-8). The detached garage was also protected by a surveillance video system. (Tr. 549). The defendant himself was present in the detached garage with the guns and drugs when police arrived to execute the warrant. (Tr. 516, 524). His guests, in contrast, were either inside the house or outside. (Tr. 523).

The third gun was found during the May 2021 search of the defendant's residence in Elko, MN, where he lived with his codefendant Danielle Thompson ("Thompson"). The defendant was present in the house when officers arrived, and he attempted to flush drugs down the drain of a utility sink before officers entered. (Tr. 657-58). Officers searching the residence found a duffle bag in the garage containing a loaded Glock 43 9mm handgun and a clown mask. (Tr. 693-96; PSR ¶ 17; Gov't Ex. 95). Inside the house on the property, officers found about 12 kilograms of methamphetamine and extensive evidence of drug trafficking, including almost $18,000 cash, packaging materials, a money counter, drug ledgers, and scales. (PSR ¶ 17; Tr. 644-58; Gov't Ex. 79, 83, 86, 88, 89-90, 92.)

During the course of the investigation into the defendant, officers also searched one of his cellular phones and found several photographs of guns, including a Glock handgun. (Gov't Ex. 64 at 8-9; Tr. 351.)

These facts are more than sufficient to satisfy the government's "very low bar" of proving the application of the enhancement. In the September 2019 search, the defendant, two firearms, over 75 grams of methamphetamine, and evidence of drug trafficking were all present in the detached garage when police arrived. In other words, "the weapon[s] [were] found in the same location as drugs," *Peroceski*, 520 F.3d at 889, and there was "a temporal and spatial nexus among the weapon, defendant, and drug-trafficking activity," *Escobar*, 909 F.3d at 240. The close proximity of guns to drugs, tools of the trade, and an area where part of the conspiracy took place is alone sufficient to support application of the enhancement. The fact that, in May 2021, officers found another gun in the garage of a house where the defendant was possessing and dealing extremely large amounts of

6

methamphetamine further reinforces that the defendant possess firearms in connection with his drug trafficking. So too does the evidence from the concerned citizen that the defendant carried firearms and sold drugs, as well as the photos of guns on the defendant's phone.

The defendant argues that the firearms from the September 2019 search were not found inside the house, instead claiming (erroneously) that the guns were found in the attached garage. (ECF 286 at 5). As noted above, the evidence at trial was unequivocal that the guns were found in the same detached garage as significant amounts of methamphetamine, cash, and tools of the drug trade. (Tr. 537-48). In any case, however, the distinction matters little as an even larger amount of methamphetamine was found in the attached garage.

The defendant also argues that the firearm from the May 2021 search cannot support the enhancement because the defendant did not reside in that house, and he therefore did not possess either the firearm or methamphetamine found therein. (ECF 286 at 6). This argument is unpersuasive. The jury clearly found that the defendant possessed the methamphetamine inside the house and the evidence that the defendant resided there was overwhelming. Surveillance officers had seen the defendant and his vehicles at the address on multiple occasions in the weeks leading up to the warrant. (Tr. 609, 686-89). The defendant was also present inside the house when officers arrived to execute the search warrant. (Tr. 612-14). The defendant's pants, which contained his cell phone and driver's license where found on the floor of the laundry room, and various paperwork in his name was found in the house. (Tr. 652-54, 655-56). Finally, two separate cooperating witnesses also testified that the defendant lived and dealt drugs out of that house. (Tr. 288, 296-98,

302-03, 312, 480-82, 493).  Accordingly, the defendant's objections to the enhancement have no merit and should be overruled.

## **DEFENDANT'S OBJECTION – AGGRAVATING ROLE – U.S.S.G. § 3B1.1**

The defendant next objects to the application of a four-level enhancement for aggravating role.  (ECF 286 at 6-7).  United States Sentencing Guidelines Section 3B1.1 provides for a four-level adjustment if a defendant acted as an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a).  Courts interprets the terms "'organizer' and 'leader' broadly." *United States v. Irlmeier*, 750 F.3d 759, 764 (8th Cir. 2014) (citing *United States v. Lopez*, 431 F.3d 313, 317-18 (8th Cir. 2005)).  For the adjustment to apply, the defendant generally "must direct or enlist the aid of others."  *Irlmeier*, 750 F.3d at 764; *accord United States v. Werkmeister*, 62 F.4th 465, 470 (8th Cir. 2023) ("Evidence that a defendant directed the criminal activities of another conspirator on one occasion, or that the defendant recruited a member into the conspiracy, is sufficient to support [the adjustment].").

The defendant need not be the *only* organizer or leader of a criminal organization for the purposes of § 3B1.1, "as there can be more than one organizer or leader of a criminal enterprise."  *United States v. Zimmer*, 299 F.3d 710, 719 (8th Cir. 2002).  Nor is it necessary "that the defendant organized or led all of the other participants in the activity."  *Id.*  Rather, "the defendant need only have directed one other participant to warrant an enhancement." *United States v. Sarabia-Martinez*, 276 F.3d 447, 451 (8th Cir. 2002).  To determine the defendant's role, the court should consider such factors as:

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Garcia*, 512 F.3d 1004, 1005 (8th Cir. 2008) (quoting U.S.S.G. § 3B1.1, cmt. n. 4).

Here, the evidence clearly shows that the defendant was a leader or organizer of the criminal activity, who organized multiple trips to Arizona to pick up large amounts of drugs. For example, in August 2020, the defendant reached out to S.B. and asked her to rent a vehicle for him, telling her that he needed it for 5 days, was going to put about 2,000 miles on it, and that she should add Heidi Fox as the driver. (Gov't Ex. 69 at 1-2). The defendant then texted Heidi Fox and told her to contact S.B. about the rental car and then come meet him as soon as she had the vehicle. (Gov't Ex. 70 at 1-2).

Heidi Fox and her boyfriend Robert McGinley ultimately drove the vehicle (rented by S.B. at the defendant's direction) down to Arizona. On their way back to Minnesota, they were stopped by police, who became suspicious of drug trafficking and called for a drug-detecting dog. (Tr. 441-47). As they were waiting for the canine to arrive, McGinley got into the car, fled the traffic stop at speeds of up to 140 mph with officers pursuing, and eventually pulled over and lit the rental vehicle on fire. (Tr. 447-53). Despite the vehicle being destroyed by fire, police were ultimately able to recover almost 12 pounds of methamphetamine from in and around the burned-out vehicle. (Tr. 453-59).

Meanwhile, S.B. began contacting the defendant about the fact that the rental vehicle had not yet been returned. (Gov't Ex. 69 at 6). The defendant instructed S.B. to

extend the rental for another day. (*Id.* at 7). When the vehicle still was not returned, S.B. began warning the defendant that the rental company was complaining about the missing vehicle, and she asked the defendant to "let me know what I need to tell [the rental company.]" (*Id.* at 9.) The defendant told S.B. he would cover the cost of the vehicle if necessary and asked S.B. to look up Heidi Fox's and Robert McGinley's names on jail rosters. (*Id.* at 12). S.B. then later reported to the defendant that "Bobby" (McGinley) had started the vehicle on fire. (*Id.* at 14). The defendant then warned her to "prepared to be talked to" by the police and instructed her to "stick with" the story that Heidi Fox needed the car to visit an ailing relative. (*Id.*). The defendant further instructed S.B. to report the vehicle as stolen and told her that she should be a "g"[2] and the defendant would keep her free from criminal responsibility. (*Id.* at 15).

After organizing this failed trip to Arizona to pick up methamphetamine in August 2020, the defendant organized at least two other similar trips in 2021. Specifically, in approximately early 2021, the defendant approached his co-conspirator Lee Dahlberg and recruited him to travel down to Arizona to pick up a large shipment of methamphetamine. (Tr. 483-84). The defendant offered to pay Dahlberg 5% of all the bulk cash that he would bring down to Arizona on the defendant's behalf, and an additional $300 per pound of methamphetamine that he brought back. (Tr. 484-85). Dahlberg needed money to pay the legal fees for his pending criminal cases and agreed to go on the trip. (Tr. 484). The defendant, however, became nervous about entrusting that much money and drugs to

---

[2] "G" is a slang term for a "gangster" and is used to denote a loyal person within criminal activity. Tr. 400; https://www.urbandictionary.com/define.php?term=G.

Dahlberg and decided that the defendant, co-defendant Thompson, and Dahlberg should all go down there together. (*Id.*). They all travelled to Arizona together with the defendant bringing about $500,000 in cash with them. (Tr. 486-87). Upon arriving in Phoenix, the defendant directed Dahlberg to drive to a particular house where they were met by a young man who took the money in exchange for pieces of luggage filled with about 200 pounds of methamphetamine. (Tr. 485-92; *see also* Tr. 298-300). The defendant paid Dahlberg for his assistance in making the trip, but the defendant kept all the methamphetamine for himself. (Tr. 493-94).

A couple of weeks later, the defendant approached Dahlberg again about going on a second trip to Arizona. (Tr. 494). Dahlberg agreed. The defendant and Dahlberg went down together, with the defendant bringing another $300,000 in cash with them. (Tr. 495). This time, the defendant directed Dahlberg to a house (this time in Tucson) where the defendant exchanged the money for large containers filled with another 200 pounds of methamphetamine. (Tr. 496-97). Once again, the defendant kept the methamphetamine for himself and paid Dahlberg for his services with money and an "allowance" of drugs. (Tr. 498).

In addition to the trips to Arizona, the defendant's leadership is demonstrated by text messages found on his phone. Specifically, the defendant's phone had text messages with his methamphetamine source of supply, who utilized a Mexican phone number. (Gov't Ex. 67; Tr. 371-383). In the messages, the defendant and his supplier engage in detailed conversations regarding the transfer of money and drugs. In particular, the defendant and his supplier make arrangements for the defendant to deliver payment to a

runner and the supplier provided the defendant with contact information for the runner. (Gov't Ex. 67 at 1-2). A couple of days later, he defendant confirmed with the supplier that he paid the runner $315,800 in cash and that he still owed $53,500, but that he had the money he owed plus more. (*Id.* at 3). The defendant also told his supplier that he still had "four containers" of methamphetamine left but "want[ed] more if I'm in line still with me taking so long to pay?" (*Id.*). The defendant offered to hold or disperse methamphetamine for the supplier, and further proposed to do "controlled drops" of money by putting it in cars and giving the location of the car to the supplier so that the supplier's people could pick it up. (*Id.* at 4). The supplier said: "that sounds like a good idea to me," noting that the defendant was more "on point" (reliable) than the supplier's other distributors, and he promised to make sure that the defendant was compensated for helping. (*Id.* at 4-5).

These facts are more than sufficient to support application of the enhancement. The evidence at trial showed the defendant was the Minnesota-based leader of a major drug trafficking organization with a direct and personal connection to a drug supplier based in Mexico. (*See* Tr. 372, 483, 747). The defendant was deeply involved in every aspect of the crime—purchasing huge amounts of methamphetamine, transporting it to Minnesota, storing it, fronting it to other dealers to sell for him, selling it personally, and accumulating huge amounts of money in the process (see *infra* p. 15-18). He recruited numerous people into the conspiracy including Thompson, Dahlberg, S.B., Heidi Fox, and Robert McGinley, and he planned and organized at least three trips to Arizona to pick up drugs. The evidence at trial demonstrated that the defendant exercised ultimate decision-making authority and claimed by-far the lion's share of the fruits of the crime.

The defendant's arguments against application of the enhancement are essentially attempts to relitigate the jury's finding of guilt. He cites a contact in Thompson's phone called "Bossman" and insinuates that Thompson, Dahlberg, C.W., and others were actually the ones responsible for the methamphetamine recovered from the Elko house. This argument is without merit. There was no evidence at trial as to the identity of "Bossman" or as to his specific involvement (if any) in the offense. (*See* Tr. 327-28). Both Thompson and Dahlberg, however, were unequivocal that the defendant was responsible for the trips down to Arizona to pick up drugs and the defendant does not challenge that testimony in any way. The defendant also claims that he did not direct Heidi Fox or Robert McGinley to pick up claiming that the text messages merely show him attempting to calm a friend who was worried about getting in trouble. This argument is not credible in light of the context of the text messages, in which the defendant actively coordinated the rental of the vehicle; whose name should be on it; how long it would be needed for; instructed S.B. to rent it for another day; coordinated the plan for returning the vehicle; expressed concern over whether S.B. had told others about the vehicle; coached S.B. to "stick with" a story because "you know the life we live." (Gov't Ex. 69 at 1-15). Accordingly, the defendant's objection to this enhancement should be overruled.

### **DEFENDANT'S OBJECTION – U.S.S.G. §§ 2D1.1(b)(16) and 3C1.1**

Finally, the defendant objects to the application of a 2-level enhancement under U.S.S.G. §§ 2D1.1(b)(16). (ECF 286 at 8). That section provides that the offense level should be increased by two-levels if the defendant receives an aggravating role adjustment and "the offense involved 1 or more of the following factors:

(A)(i) the defendant used . . . friendship, affection . . . to involve another individual in the illegal purchase, sale, transport, or storage of controlled substances, (ii) the individual received little or no compensation . . . , and (iii) the individual had minimal knowledge of the scope and structure of the enterprise;

. . .

(D)   the defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense; [or]

(E)    the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood,

*Id.*  A "pattern of criminal conduct engaged in as a livelihood" means planned criminal acts occurring over a substantial period of time from which the defendant derived yearly income of at least 2,000 times the federal minimum hourly wage and the totality of the circumstances shows the criminal conduct was the defendant's primary occupation. U.S.S.G. § 2D1.1 cmt. 20(c), and § 4B1.3.

As discussed above, the defendant played an aggravating role in the offense.  The only question, therefore, is whether any of the other enumerated factors apply.  Probation determined the enhancement applied because the defendant used affection to involve his co-defendant Thompson in the offense.  (PSR ¶ 30).  The government, however, does not support application of the enhancement on this ground because it believes that Thompson did not receive "little or no compensation" from the offense, but rather profited substantially from the crime.  Indeed, Ms. Thompson was found with significant amounts of money during the offense and testified at trial that she was essentially living off drug dealing at the time.  (Tr. 287).

Nonetheless, the Court should still apply the enhancement because the defendant committed the present offense as part of a pattern of criminal conduct engaged in as a livelihood. In determining a defendant's primary occupation for the purposes of applying the enhancement, "a court may consider evidence regarding the market value of the drugs sold as well as evidence that defendant lacked gainful employment." *United States v. Ford*, 987 F.3d 1210, 1215 (8th Cir. 2021). Here, the evidence shows that the defendant had no regular or normal employment during the conspiracy. (Tr. 251, 295, 483). The defendant did, however, make tremendous amounts of money from drug dealing. During the conspiracy, the federal minimum wage was $7.25 per hour.[3] Two-thousand times that hourly wage is $14,500, meaning the government must prove the defendant "derived more than $14,500 in income from his drug activity." *United States v. Denson*, 967 F.3d 699, 706 (8th Cir. 2020). This "refers to gross income, not net," and "a substantial cash flow from criminal activity is sufficient evidence to satisfy the 'income' requirement." *Id.*

The evidence shows that between June 2020 and May 2021, the defendant made millions of dollars from his drug trafficking. For example, the defendant's text messages with his supplier show that in July 2020, the defendant paid $315,800 to his drug supplier and reported having more than enough money to pay the remaining $53,500 he owed. (Govt's Ex. 67 at 3).

Less than three weeks later, in early August 2020, the defendant took photographs using his phone of him in possession of four large Tupperware containers full of cash. Just

---

[3] https://www.dol.gov/general/topic/wages/minimumwage.

one of those Tupperware containers had "162,500" written on the top—suggesting that the defendant was in possession of approximately $650,000 between all four containers.



(Gov't Ex. 64 at 4-5).[4]

A little over two months later, on October 16, 2020, police arrested the defendant in an RV with $307,390 in cash in various locations. (PSR ¶ 16). This money was <u>not</u> packaged in the sealed green Tupperware containers—indeed, the green Tupperware containers were found empty in the RV—demonstrating that this money was separate and distinct from the cash pictured on the defendant's phone:

---

[4] *See* Gov't Sent. Ex. A (the metadata from the defendant's phone showing that these photographs were taken on August 8 and 9, 2020).



(Gov't Ex. 25 at 2; Gov't Ex. 27 at 3; *see also* Gov't Ex. 17 at 5-6 (showing the empty green Tupperware containers)).

A few months later, in early 2021, the defendant brought $500,000 in cash down to Arizona to purchase 200 pounds of methamphetamine. (Tr. 486-92). A few weeks later, he brought down another $300,000 to Arizona as part of the purchase of another 200 pounds of methamphetamine. (Tr. 495-97).

Finally, in May 2021, the defendant was arrested at his house in Elko, Minnesota, in possession of large amounts of meth and another $17,930 in cash. (PSR ¶ 17). According to testimony *elicited by the defendant* at trial, officers missed another $200,000 that was stored in a secret compartment in their search of the house. (Tr. 508-10).

In sum, between June 2020 and May 2021, the evidence shows the defendant having income of over two million dollars:

$315,800    (July 2020 text messages)
$650,000    (August 2020 photographs)

| | |
|---|---|
| $307,390 | (October 2020 RV search) |
| $500,000 | (early 2021 first Arizona trip) |
| $300,000 | (early 2021 second Arizona trip) |
| $17,930 | (May 2021 Elko house search |
| $200,000 | (May 2021 cash missed in search warrant) |
| **$2,291,120** | **(total income between June 2020 and May 2021)** |

If anything, this evidence likely understates the defendant's income during that one-year period, as a cooperating source—whose information ended up being substantially corroborated—told police in September 2020 that the defendant was selling approximately $250,000 of methamphetamine per week.  (PSR ¶ 15).  Accordingly, the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood, and his objection to this enhancement should be overruled.

## GOVERNMENT'S OBJECTION – OBSTRUCTION OF JUSTICE

The government objects to the PSR's failure to apply a 2-level upward adjustment for the defendant obstructing justice.  The PSR found that an obstruction adjustment was warranted but declined to apply the adjustment because the defendant already received a 2-level enhancement under U.S.S.G. § 2D1.1(b)(16) (discussed above).

The Guidelines provide that the Court should not apply the upward adjustment for obstruction of justice "if the defendant receives an enhancement under § 2D1.1(b)(16)**(D)**"—for having an aggravating role and engaging in obstruction of justice. *See* U.S.S.G. § 3C1.1 cmt. 7.  As discussed in detail above, however, the government believes that the defendant should receive the enhancement under 2D1.1(b)(16)**(E)** for committing the offense as part of a pattern of conduct engaged in as a livelihood—not

merely (D). Thus, the defendant should also still receive the 2-level upward adjustment under § 3C1.1.

Because the defendant's offense level is already capped at a level 43, however, the Court need not address this objection unless it sustains some or all of the defendant's other objections to the Guidelines calculations and finds that the defendant's total offense is less than 43. Otherwise, it is not necessary for the Court to rule on this objection because it does not affect the defendant's ultimate Guidelines range given the Guidelines cap on the offense level of 43. *See* Fed. R. Crim. P. 32(i)(3)(B).

Should the Court find it necessary to rule on this objection, however, it should apply the enhancement for obstruction. First, the defendant obstructed justice in connection with the investigation and prosecution of the offense by coaching a witness (S.B.) to lie to police about the purpose of renting a car after organizing a failed trip to Arizona to pick up methamphetamine.



(Gov't Ex. 69 at 14).

To: +16124992225

Reporting it stolen will take all the heat off you and that fits their profile. They have cases for stolen vehicles right now. I know you did nothing but you know the life we live your a g and I'll my word and do what it takes to keep you free of any responsibility

| Participant | Delivered | Read | Played |
| --- | --- | --- | --- |
| +16124992225 | | | |

8/18/2020 11:03:05 AM(UTC-5)

(Gov't Ex. 69 at 15).

Second, the defendant committed obstruction by committing perjury at trial. Under U.S.S.G. § 3C1.1, obstructive conduct includes: "committing, suborning, or attempting to suborn perjury." *Id.*, cmt 4(B); *see also United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2004) ("Committing perjury at trial constitutes an obstruction of justice within the meaning of § 3C1.1"). In making the determination, the Court cannot merely rely on the fact that the jury did not believe the defendant's testimony, but must make an independent determination that the defendant "gave 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Flores*, 362 F.3d at 1038 (quoting *United States v. Taylor,* 207 F.3d 452, 454-55 (8th Cir. 2000)). A "material" matter means that defendant's testimony, "if believed, would tend to influence or affect the issue under determination." *United States v. King*, 854 F.3d 433, 446 (8th Cir. 2017) (citing USSG § 3C1.1 cmt. n.6). "The false testimony or statements need not have caused the government actual prejudice to be material." *Id.* Ultimately, the Court need only "find[] by a *preponderance of the evidence* that a defendant committed perjury" to apply the enhancement. *Id.* (emphasis supplied).

Here, the defendant clearly committed perjury at trial.  Despite the overwhelming evidence against him, the defendant categorically denied being involved in trafficking drugs at any point during the charged conspiracy.  (Tr. 795).  He further denied any knowledge of—or involvement with—any of the large amounts of drugs, cash, or tools of drug trafficking found in each of the three main searches constituting the charges against him: the September 2019 search of his Richfield house, the October 2020 search of his RV, and the May 2021 search of his Elko house.

With respect to the September 2019 search of his house, for example, the defendant claimed that he had no knowledge of the methamphetamine found in his attached garage—despite the open and obvious presence of 75+ grams of methamphetamine and tools of the drug trade found in the detached garage that the defendant himself occupied at the time of the search.  (Tr. 786; PSR ¶ 12; Tr. 517-48).

Similarly, with respect to the RV in which he was arrested with numerous pounds of methamphetamine, the defendant claimed that he did some mechanical work on the RV but wasn't living there.  (Tr. 793, 835).  This claim was contradicted by testimony from multiple witnesses that the defendant lived and sold drugs out of the RV, as well as the fact thar the defendant had photographs of himself inside the RV on his phone, and many of his belongings (*e.g.*, ID, tax documents, vehicle registration, personal photographs, and receipts) were found there.  (*See*, *e.g.*, PSR ¶ 16; Tr. 282, 288-292, 479-80, 879; Gov't Ex. 38, 40, 44, 46, 48A-B, 64).  Instead, the defendant claimed that a (now-deceased) friend C.W. had the RV last before police searched it, but that C.W. was able to sneak away unseen by anyone when police arrived.  (Tr. 797-99).  This claim—that C.W. was present—

21

contradicted the testimony of both Thompson and the officers who responded to a call for services regarding the RV. It was also contradicted by the fact that DEA surveillance showed the defendant using the RV alone on October 15, 2020—just a few hours before it was searched by police—at a time and place when the defendant claimed he did not have the RV. (Tr. 252-56, 866-68; Gov't Ex. 12). Moreover, the evidence showed that defendant could not be excluded as a contributor to DNA found on one of the drug packages inside the RV. (Gov't Ex. 102).

With respect to the Elko house, the defendant claimed that Thompson was staying there with C.W. and that he only stayed in the vehicle shop behind the house. (Tr. 803). He denied knowledge of the large amounts of drugs inside the Elko house. (Tr. 808). This testimony was contradicted by the overwhelming evidence that the defendant resided and dealt drugs out of that house, as discussed *supra* p. 7-8. Moreover, the defendant's testimony was contradicted by photographs on the defendant's phone, showing numerous large packages of methamphetamine taken in the same basement bar area of the Elko house where police found pounds of methamphetamine. (Tr. 658-61; Gov't Ex. 99).

Finally, the defendant also testified untruthfully about other matters. For example, he claimed that he had no knowledge of the text messages with the Mexican supplier on his phone and said those texts must have happened when C.W. borrowed the defendant's phone on one occasion. (Tr. 815). The text messages, however, occurred over the course of four days—a highly improbable amount of time for someone to let a friend borrow their phone—and the messages started with the Mexico-based source of supply contacting the defendant's phone (not the defendant's phone contacting the supplier as you would see if

C.W. was borrowing the defendant's phone to engage in the illegal activity).  (*See* Tr. 889-97; Gov't Ex. 67).

Similarly, the defendant claimed that the texts on his phone with Dahlberg were not about drugs, but rather were about the defendant selling Dahlberg some stolen Bobcats and a John Deere skid loader.  (Tr. 792, 816-17).  This was not only contradicted by Dahlberg's testimony that he was selling drugs from the defendant on the date of the messages, *compare* Tr. 478-79 *with* Gov't Ex. 65 at 9-10, but the defendant's account simply did not fit with the messages themselves which discussed "need[ing] it bad" and "bring[ing] me a half."  (Tr. 897-99).

In sum, the defendant's general denial of knowledge of any kind of drug trafficking and attempt to defect blame onto Thompson and C.W. was unabashed perjury contradicted by virtually every single piece of evidence in the case.  Accordingly, the Court should sustain the government's objection and apply a 2-level increase for obstruction of justice under U.S.S.G. § 3C1.1

## POSITION ON SENTENCING

The only issue before the Court is what constitutes a reasonable sentence in light of the factors enumerated in Title 18, United States Code, Section 3553(a).  In fashioning a sentence, Section 3553(a) requires the Court to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense; the need for deterrence; the need to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a).  Given the many aggravating factors in the case, the

government believes a very lengthy sentence is necessary to provide just punishment for the offense, provide adequate deterrence, and protect the public from the defendant's crime. Nevertheless, the government recognizes that a life sentence is greater than necessary to accomplish the purposes of sentencing enumerated in 18 U.S.C. § 3553(a), and instead requests a sentence of no less than 300 months.

The defendant's conduct in this case is extremely serious even by federal court drug trafficking standards. The defendant led a drug trafficking organization that imported and sold massive amounts of methamphetamine in Minnesota. The defendant's crime is notable for its scope—in terms of both time and quantity of drugs. His involvement in the crime persisted for almost two years and only ceased when he was indicted in the present case and held in federal custody pending trial. In those two years, the defendant was directly responsible for obtaining and distributing a truly staggering amounts of drugs. In three separate search warrants of the defendant's residences, police seized 18 kilograms (about 40 pounds) of methamphetamine from him. (PSR ¶¶ 12, 16-17). Even that large amount, however, does not even begin to do justice to the volume of methamphetamine trafficked by the defendant over those two years. For example, as discussed above, evidence from the defendant's cell phone established that, in July 2020, the defendant paid his Mexico-based drug supplier about $318,000 for methamphetamine he had purchased and owed him still $53,500 more. (Gov't Ex. 67 at 3). Within a couple of weeks, the defendant had approximately $650,000 more in cash packaged up and labeled for payment to his supplier. (*See* supra, p. 15-16). As the government's drug trafficking expert testified, the approximately $1 million dollars the defendant was paying to his supplier for drugs in

July-August 2020 would likely represent over 1,000 pounds of methamphetamine when purchased from near the Mexican border (as the evidence in this case suggests that it was). (Tr. 759).[5] This fit with information police received from a cooperating individual, who stated that the defendant was selling "hundreds of pounds" of methamphetamine during this time. (PSR ¶ 15). Moreover, both Dahlberg and Thompson provided mutually corroborating testimony at trial that the defendant orchestrated two trips down to Arizona in early 2021, during which he purchased about 400 total pounds of methamphetamine.[6] In sum, the evidence clearly establishes that the defendant was not just involved trafficking 40 pounds of methamphetamine, but more likely over a thousand pounds.

This truly extraordinary quantity of methamphetamine calls for an extraordinary sentence. Given that methamphetamine is a drug that is typically consumed in quantities ranging from fractions of gram to a gram, the approximately one thousand pounds (453,592 grams) of methamphetamine the defendant was involved in trafficking represents *many hundreds of thousands of doses* of an extremely dangerous drug that causes incalculable

---

[5] Specifically, the government's drug trafficking expert testified that a pound of methamphetamine typically costs about $700-750 when purchased from near the border, meaning that $1,000,000 could purchase as much as 1,300-1,400 pounds. (*See* Tr. 759). As the drug trafficking expert testified, drug traffickers can get lower prices when they buy in bulk or have a direct connection to a source of supply in Mexico (rather than having to go through an intermediary)—which the defendant did. (Tr. 756-57). Even if we assume the defendant was paying the expert's estimated "local" (Minnesota) price of $2,000 per pound of meth, $1 million would still amount to 500 pounds of the drug. (Tr. 758).

[6] Dahlberg also testified that he had seen the defendant with 50 pounds of methamphetamine in the RV and "over 200 pounds" of methamphetamine in his Elko house. (Tr. 476-77, 482). Likewise, Thompson testified to getting about 100 pounds of methamphetamine form the defendant over the course of their relationship. (Tr. 285-86). The government is excluding those amounts here to avoid double-counting.

harm to the health and welfare of the community. The quantity that the defendant was involved in trafficking is over 10 times the amount of methamphetamine mixture—and over 100 times the amount of actual methamphetamine—needed to reach the highest offense level of 38 under the Guidelines. Indeed, the Guidelines themselves recognize that drug quantities of this extreme magnitude should be considered an aggravating factor that may even justify an upward departure. *See* U.S.S.G. § 2D1.1, cmt. 27(B) (noting that "[i]n an extraordinary case, an upward departure above offense level 38 on the basis of drug quantity may be warranted. For example, an upward departure may be warranted where the quantity is at least ten times the minimum quantity required for level 38.").

It is not just the extraordinary drug quantity, however, that makes the present offense so serious. The defendant's role in the offense is also aggravating. The defendant was the leader of the organization and bears direct responsibility for the full scope of the enterprise. The defendant negotiated and coordinated directly with the foreign-based source of supply. He personally handled payments of hundreds of thousands of dollars to his suppliers. He supplied lower-level dealers like Thompson and Dahlberg so they could distribute the drugs for the organization, and he had his own customers as well. He organized trips to Arizona to pick up large quantities of drugs and recruited others to assist him in making those trips. Because of the defendant's actions, several other people have had their lives upended, been charged with drug crimes, and even gone to prison—including Thompson, Dahlberg, Heidi Fox, and Robert McGinley. Dahlberg, for example, testified that—during his association with the defendant—he went from being a college-educated business owner with a wife of 20 years and a young son, to a meth addict with 17 felony cases sentenced

to 90 months in prison.  (Tr. 465-66, 470-74).  That testimony is emblematic of the havoc the defendant's conduct wreaked on those around him, to say nothing of the addiction, crime, and suffering fueled by the drugs the defendant put into the community.

The defendant also willfully compounded the seriousness of his offense in several other ways.  First, the defendant was engaged in other criminal conduct at the same time as the drug conspiracy—committing a brazen theft by ripping an ATM from its moorings and stealing $79,000 less than a month before the search warrant at his Richfield house.  (PSR ¶ 9-11).  Second, although drug dealing is an inherently dangerous activity on its own, the defendant exacerbated the danger of his conduct by possessing firearms during the conspiracy.  Third and finally, the defendant utterly failed to take any responsibility for his conduct in this case.  He did not merely exercise his constitutional right to go to trial and put the government to its burden of proof, but rather he coached a witness against him (S.B.), took the witness stand, and repeatedly violated his oath by offering perjurious testimony about almost every aspect of the charges against him.  He not only denied his own responsibility for the offense but he also attempted to deflect blame onto Thompson, Dahlberg, and his deceased friend C.W.

The history and characteristics of the defendant are also extremely aggravating.  The defendant has a lengthy criminal history dating back to when he was 18 years old.  The present case is his seventh felony case and his fifth drug-related felony.  (PSR ¶¶ 43-45, 47-48, 52).  It is also his second federal drug case—having previously been convicted in this district of conspiracy to distribute cocaine and conspiracy to conduct financial transactions involving the proceeds from cocaine distribution.  (PSR ¶ 48; Crim. No. 90-

48 PSR ¶ 7). In the prior federal case, the defendant was involved in distributing more than 15 kilograms of cocaine and was identified as the "main source of the cocaine to the Minnesota area and the leader of [the] organization." (Crim. No. 90-48, PSR ¶ 7). Similarly to the present case, the defendant would travel to a border state to purchase cocaine, import it to Minnesota, and distribute it here through a network of runners. (*Id.*). The defendant would instruct the runners who to contact and where to meet. (*Id.*).

The Honorable Edward J. Devitt sentenced the defendant to 240 months in prison for his conduct in the prior federal case.[7] Yet even that substantial sentence was not sufficient to promote respect for the law or deter the defendant from committing new crimes. Rather, during his time in the BOP, the defendant committed over two dozen infractions related to possession of intoxicants, possession of drugs and drug paraphernalia, and refusing orders. (*Id.*). Upon his release into the community, the defendant proceeded to violate the terms of his supervised release three time by using drugs and committing new crimes—ultimately leading to his supervision being revoked and him being sentenced to an additional 18 months in prison. (*Id.*).

Despite a total term of 258 months of incarceration on his prior federal case, the defendant still was not deterred and returned to drug trafficking within a matter of just a

---

[7] In defendant's prior federal case, the offense level was 36 based on a base offense level of 34 (for the offense involving 15-50 kilograms of cocaine) with a four-level enhancement for the defendant being a leader or organizer of the offense and a 2-level reduction for acceptance of responsibility. (*See* Crim. No. 90-48, PSR ¶¶ 19-24, 32). Combined with a criminal history category of V, this resulted in a Guidelines range of 292-365 months imprisonment, with a downward departure to 240 months on the government's motion. (*Id.* ¶¶ 45, 50, 71).

few years.  Indeed, the defendant's drug trafficking activity not only continued but *escalated*, with the defendant graduating from distributing 15-20 kilograms of cocaine in his prior case to distributing hundreds of kilograms of meth and generating revenue of millions of dollars in the present case.  (Crim. No. 90-48, PSR ¶¶ 7-13).  Unlike in his prior federal case, the defendant also failed to take any responsibility for his crime, went to trial, and obstructed justice by committing perjury.

Not only was the defendant undeterred by 258 months in prison on his prior case, but he was also undeterred by being twice caught by police with drugs in this very case. Specifically, the defendant was arrested after being found in possession of 500+ grams of methamphetamine and two guns in the September 2019 search of his Richfield house.  He was briefly jailed and then released.  Rather than taking his arrest as a wake-up call and abandoning his criminal activity, the defendant instead returned to crime and began dealing drugs again as early as the summer of 2020.  He was given yet another chance to abandon his drug dealing when he was arrested in possession of 12 pounds of methamphetamine in an RV by Bloomington police in October 2020.  Once again, he was briefly jailed, released, and promptly returned to trafficking methamphetamine.  In other words, the defendant has had innumerable opportunities to demonstrate a willingness to change his behavior, but has always returned to drug dealing.

Although the nature of the offense and the defendant's criminal history are exceptionally aggravating, the government recognizes there are some mitigating factors. The defendant is 58 years old and is in reasonably good health, but he will be likely be more than 70 years old when he is released from his term of incarceration in this case.  The

government acknowledges that recidivism rates typically decrease with age, but that data should be viewed with caution here because the defendant has demonstrated an extraordinary degree of incorrigibility even into his late 50s. The government also acknowledges the information in the presentence report that the defendant had a difficult upbringing, but he did share a close relationship with his parents—something many drug defendants cannot claim. The defendant also has a history of substance abuse—including daily methamphetamine use—though the circumstances of the present offense are not consistent with someone engaged in drug trafficking merely to support an addiction. Finally, the government notes that the defendant graduated high school and has some education and experience as a mechanic that could have supported a legitimate income. (PSR ¶ 96, 98).

On balance, however, the mitigating factors are substantially outweighed by the numerous aggravating aspects of the offense. While a sentence of life imprisonment is greater than necessary to accomplish the purposes of sentencing, the government believes that a just sentence must be substantially greater than the 240 months the defendant received for his prior federal offense. Having already been to prison for 240 months, the defendant knew precisely what the consequences of his return to drug dealing would be and consciously made the decision to commit the offense. Given that the defendant's sentence is significantly more serious than his prior federal offense, a significant graduated sanction is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, and protect the public from further crimes of the defendant. Accordingly, the Court should sentence the

defendant to no less than 300 months in prison.

## **CONCLUSION**

For all the foregoing reasons, the United States respectfully recommends that the

Court sentence the defendant to no less than 300 months in prison.

Respectfully submitted,

Dated:  August 27, 2024                     ANDREW M. LUGER
United States Attorney


/s/ *Nathan H. Nelson*

BY:  NATHAN H. NELSON
Assistant U.S. Attorney
Attorney ID No. 388713